**UNITED STATES of America, Appellee,**

v.

**Eugene CALLABRASS, Appellant.**

**No. 1059, Docket 79–1001.**

United States Court of Appeals,
Second Circuit.

Argued May 15, 1979.

Decided Sept. 26, 1979.

---

John J. Hayden, Goshen, N. Y., for appellant.

Richard F. Lawler, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y., Richard D. Weinberg, Asst. U. S. Atty., New York City, of counsel), for appellee.

Before OAKES and VAN GRAAFEILAND, Circuit Judges, and CARTER, District Judge.*

ROBERT L. CARTER, District Judge:

Eugene Callabrass appeals from a judgment of conviction entered in the United States District Court for the Southern District of New York, Pierre N. Leval, Judge. Following a jury trial, appellant was convicted of conspiracy to manufacture phencyclidine (also known as "PCP" or "angel dust") in violation of 21 U.S.C. § 846, manufacture of PCP in violation of 21 U.S.C. §§ 812, 841(a), and 841(b)(1)(B), and 18 U.S.C. § 2, and possession of PCP with intent to distribute it in violation of the same statutory sections. The court sentenced appellant to serve two and one half years' imprisonment on the conspiracy and possession counts, to be followed by three years of special parole, and to a concurrent sentence of five years' probation on the manufacturing count.

Defendant's principal claim on appeal is that the seizure of certain drug-making equipment by a police officer summoned to the scene of a fire violated the Fourth Amendment. Accordingly, he argues that the narcotics paraphernalia should have been excluded at trial. Appellant also contends that, even including the contested articles, the evidence against him was insufficient to support a guilty verdict on the conspiracy count and that, without the contested articles, the evidence on the substantive counts would have been insufficient. For the reasons set forth below, we affirm the judgment.

Taking the evidence in the light most favorable to the government, as we must when we review a guilty verdict or a denial of a motion to suppress, *see United States v. Oates*, 560 F.2d 45, 49 (2d Cir. 1977), the evidence indicates that appellant, with the assistance of two codefendants, Raymond B. Cromer and Adie White, engaged in the manufacture of PCP at two locations, an apartment at 135 West 183rd Street in the Bronx and a house at 146–93 183rd Street (described as "a middle class residential neighborhood") (Tr. 62) in Queens. In November 1977, appellant, under the false name "Eugene Jones," began purchasing

* Of the Southern District of New York, sitting by designation.

the necessary chemicals and laboratory equipment from SGA Scientific, Inc., a laboratory supply house in New Jersey, having the invoices made out to his codefendant, White. At some point, the supply house alerted law enforcement authorities to the purchases. On February 2, and again on February 10, 1978, agents of the Drug Enforcement Administration (DEA) observed appellant delivering to the Bronx apartment boxes of the materials that he had picked up at the laboratory supply house. Appellant had leased the apartment in the Bronx under the same false name that he had used to purchase the chemicals and equipment. On February 2, appellant was also observed purchasing a quantity of loose spearmint tea leaves, which are commonly sprayed with PCP and then smoked. When DEA agents later searched the Bronx apartment they found among other items SGA cartons, a glass beaker bearing appellant's fingerprints as well as those of Cromer, and a plastic spray top which had been used to apply PCP and contained a residue of that narcotic substance.

In mid-February, 1978, appellant, again using the name Eugene Jones, arranged to rent the Queens house from one Frank Mercurio. Appellant told Mercurio that he, Jones, and his wife would occupy the house as a residence. Evidently Mercurio had prepared a draft lease; and although the parties had not signed a lease, Mercurio had given appellant the right to enter the empty house to paint it.

At about 4:00 p. m. on February 19, a fire erupted in the back bedroom of the house. New York City Fire Department Engine 311 answered the call. While one group of firefighters was putting out the fire, another vented the building by knocking out windows and made a so-called "primary search" for victims. Although the fire was extinguished, the firefighters opened up the ceilings, walls, and window moldings in accordance with their usual custom to make sure that the fire was not smoldering. They also made an extensive "secondary search" of the entire house, again looking for victims or anybody who might have tried to hide from the fire. This search involved opening closets and cabinets and looking under the sink and in a clothes hamper. In the course of this search the firefighters found chemicals, scales, and vials in the kitchen and the bedroom where the fire had started. In addition they found books and papers in the kitchen area. They labeled the fire suspicious and called the police. It was subsequently ascertained that an explosion of some of the volatile chemicals that were used in the manufacture of PCP had caused the fire.

The firefighters found no sign of individuals living in the house although when they entered they heard music playing from either a radio or television. They found no food in the refrigerator, only one item of clothing, no bedding, and only a couch and a bed for furniture. Neighbors had seen two men flee from the house at the time of the fire and attempt to enter a Ford Pinto parked nearby. The keys to the Pinto were found in the house and later were turned over to the police officer who had arrived in response to the fire lieutenant's notification of the suspicious fire. The fire had been extinguished and the primary and secondary searches completed within an hour and fifteen minutes, but the house was not secure. The owner or occupants could not be located; nearly all the windows and both doors were broken; there was neither heat nor electricity in the house although this was the dead of winter; large quantities of possibly dangerous chemicals, later found to include piperidine, cyclohexanone, benzene, and ether were in plain view; and broken glass from the windows was scattered throughout the house.

Patrolman Shyne, the first police officer to reach the house, arrived at 4:30 p. m., approximately one-half hour after the original notification to the fire department. Shyne surveyed the condition of the house, helped the firefighters in their secondary search for victims, and received the keys to the Pinto. Before the firefighters left, a veteran fire department lieutenant told Shyne that a dangerous condition existed in the house because of the chemicals. Patrolman Shyne saw the chemicals and various

"articles that pertained to a possible drug factory." He then notified the local police station of the condition of the premises and attempted to secure the door to the home and to learn from neighbors the identity of the owner. Unable to locate the owner or to secure the apartment, Shyne and his partner then stationed themselves outside the premises and waited for assistance.

Shortly thereafter, a number of detectives from the local precinct arrived. Shyne escorted them through the house as they surveyed the scene. Unfamiliar with what they saw, the detectives left everything undisturbed and awaited further help. At 6:45 p. m., someone from the local police station summoned to the house Detective David Cassidy of the Queens Narcotics Squad, who was at home on his day off, a Sunday. He arrived at approximately 8:00 p. m. and joined the other police officers already waiting there. Cassidy soon noted pieces of narcotics paraphernalia, including glassine bags, strainers, scales, large plastic bottles labeled "Lactose," assorted vials, beakers, and burners, and a large bottle of parsley leaves and a large bag of loose tea leaves, each of which evidently serves the same purpose as do the spearmint leaves subsequently found at the Bronx apartment. On the floor of the living room Detective Cassidy found a number of loose papers, books, and notebooks with writing in them, including a notebook with the name "A. White" written across the front. Among the books and papers were chemistry textbooks, a book entitled "Cocaine Consumers Handbook," see *United States v. Pugh*, 566 F.2d 626 (8th Cir. 1977), *cert. denied*, 435 U.S. 1010, 98 S.Ct. 1885, 56 L.Ed.2d 393 (1978), and a pamphlet entitled "The Synthesis of Phencyclidine and Other 1–Arylcyclohexylamines."

Detective Cassidy identified the ether and benzene as potentially explosive and ordered that the chemicals without visible markings be treated as hazardous. He was also fearful that because of the weather and the open windows, bottles might freeze and break open or leak. He permitted no smoking and summoned the Bomb Squad. The Bomb Squad arrived at some time after 8:00 p. m. and removed the chemicals from the premises. The ether was transported by bomb carrier and the other chemicals, which included potassium cyanide and chloroform, were placed in another vehicle for the trip to the police range. Among the chemicals found were two bottles from SGA Scientific that DEA agents had secretly marked before appellant had picked them up.

Detective Cassidy vouchered the notebooks and papers seized on the premises, including the notebook labelled "A. White" which set out in detail the procedures for manufacturing PCP, customers' copies of the invoices for the materials purchased from SGA Scientific, and a utility bill for the Bronx apartment addressed to "Eugene Jones." At Cassidy's direction, the other police officers at the scene packed for removal the items apparently used in the narcotics laboratory including glassware, strainers, heating units, scales and disposable rubber gloves. By virtue of the thorough secondary search that the firefighters had already conducted, all of the cabinet doors were open, and the seized items were primarily outside the cabinets on the sink, counters, floor, or furniture.

The following day Detective Cassidy confirmed at the police laboratory that the chemicals and other material indicated that a PCP laboratory had been in operation. On the second day following the fire, Cassidy finally located the owner of the house, Mercurio, and received his consent to reenter the premises. Upon doing so, he found in one of the closets a white shirt with appellant's initials "E.F.C." Also, in the snow where the Pinto had been parked, Cassidy found a blue lab coat containing a note written by appellant.

The central issue argued on appeal is whether Cassidy's warrantless entry into the apartment and subsequent seizure of the evidence was lawful under *Michigan v. Tyler*, 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978), the case in which the Supreme Court considered "the applicability of the Fourth and Fourteenth Amendments

to official entries onto fire-damaged premises." *Id.* at 501, 98 S.Ct. at 1946. There, the Court held that although the warrant procedures of the Fourth Amendment applied to official entries to investigate a suspicious fire, entry into a "burning building clearly presents an exigency of sufficient proportions to render a warrantless entry 'reasonable.'" *Id.* at 509, 98 S.Ct. at 1950. Thus the question is whether Cassidy's warrantless 8:00 p. m. entry to supervise the investigation was justified by exigent circumstances.[1]

Appellant concedes, as well he must, that the initial entry by Shyne was justified by the same exigent circumstances present in *Michigan v. Tyler*, viz., a suspicious fire. Nonetheless, he objects to Cassidy's later entry on the ground that circumstances excusing the failure to obtain a search warrant no longer existed at 8:00 p. m. when Cassidy arrived.

In *Tyler*, firemen responded to an alarm shortly before midnight. While dousing the flames a fire lieutenant observed evidence of arson and called a fire marshall and a police detective. They entered the building at approximately 3:30 a. m., but their investigation was hampered by darkness, steam, and smoke. At 9:00 a. m. the next morning, they reentered the building and seized certain evidence. Later, nearly four weeks after the blaze, the detective again reentered the building and took photographs. Deciding that the exigency resulting from the fire was not necessarily extinguished with the last flame, the Court held that

"officials need no warrant to remain in a building for a reasonable time to investigate the cause of a blaze after it has been extinguished." *Id.* at 510, 98 S.Ct. at 1950. The Court thus approved the admission of evidence that had been seized the morning following the fire but excluded evidence seized thereafter on the ground that the subsequent searches should have been conducted pursuant to a valid warrant.[2]

The time between the end of the fire and the post-fire entry approved as "reasonable" in *Michigan v. Tyler* was six hours. In the case at bar, there was only a three-hour lapse between the time when the blaze had been extinguished and the time when Cassidy entered the premises. Unable to show that the length of the delay was unreasonable, Callabrass argues that Cassidy's entry was nonetheless illegal because his purpose was to conduct a drug investigation and because the delay in the investigation resulted from decisions made by the officers present at the scene and not from external circumstances.

Appellant initially argues that since Cassidy, a narcotics detective, was really called in to investigate a "possible drug factory," he should have first obtained a warrant. We do not see, however, how Cassidy's subjective intention controls the question of whether there were exigent circumstances justifying his warrantless entry. A prompt investigation was required in *Tyler* to "preserve evidence from intentional or accidental destruction." *Id.* at 510, 98 S.Ct. at 1950. Here the need was at least as

---

1. The government contends for the first time that appellant lacks standing to object to the search of the house because he was only negotiating with Mercurio, the owner of the house, to rent the premises, no lease of the premises had been signed and appellant had been given access to the house only to paint. In addition, the government points out that appellant has asserted no ownership interest in the items seized. We prefer to dispose of the matter on the merits and assume appellant has standing to contest the search.

2. The Court also noted that the fact that the officers had left and then reentered the premises did not necessarily require them to get a warrant before returning.

Little purpose would have been served by their remaining in the building except to remove any doubt about the legality of the warrantless search and seizure later that morning.

*Michigan v. Tyler, supra,* 436 U.S. at 511, 98 S.Ct. at 1951. Similarly, the fact that Cassidy entered subsequent to Shyne does not necessarily require him to have had a warrant. If there were exigent circumstances necessitating his prompt arrival, *see* text, *infra,* then Cassidy's entry was either, like the 9:00 a. m. entries in *Tyler,* "no more than an actual continuation of the first [entry]," *id.* at 511, 98 S.Ct. at 1951, or a second warrantless entry independently justified by exigent circumstances.

great since many of the substances found in the apartment were volatile. At the time when Cassidy arrived, the house was unsecured and filled with poisonous and explosive chemicals which could escape if allowed to freeze. Neither the owner nor the occupants could be found. Regardless of what Cassidy hoped to accomplish by seizing the evidence, prompt action was required to secure items easily prone to accidental or intentional destruction.

The exigency in the case at bar was not only limited to the ephemeral nature of the evidence. There was also a need to dispose of the dangerous chemicals quickly so as to render the premises safe. Appellant suggests that since the investigation was delayed by the decision to await Cassidy's arrival (and not by "irresistible forces" like the darkness, steam, and smoke which hampered the investigation in *Tyler*), the need to dispose of the chemicals could not have been compelling. Appellant claims that the operation was a ruse and that the officers merely stalled until they could get a narcotics detective to the scene.

■ The need for prompt removal of the substances found on the premises is not belied by the lapse of time between their discovery and Cassidy's arrival. Evidently, neither Shyne nor the other officers were familiar enough with the chemicals to supervise their disposal, and they therefore decided to await experienced help. We have no doubt that Cassidy was chosen to supervise the investigation into the fire because of his experience with drug-related paraphernalia and ingredients. But this expertise was a double-edged sword: Cassidy's experience with substances used in the manufacture of narcotics enabled him to supervise the disposal of the chemicals as well as to instruct Shyne on what items were of evidentiary value and should be seized. The suggestion that the entire operation was a ruse is thus without support

in the record. As soon as Cassidy arrived, he ordered those present not to smoke and segregated the chemicals that would have to be removed by the Bomb Squad from those that could be safely transported in the squad car. We can not imagine that the Fourth Amendment required either that Cassidy obtain a warrant before moving the chemicals or that the officers who first arrived dispose of the chemicals despite their lack of expertise. Once lawfully within the premises, Cassidy was entitled to seize evidence of crime within his plain view.[3] *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *United States v. Bererguer*, 562 F.2d 206, 210 (2d Cir. 1977).

■ Callabrass also claims that the district court erred in permitting the admission of certain items whose evidentiary value was not readily apparent. In particular, he refers to glassware that was seized and to the notebook labelled "A. White." As Judge Leval noted below, the officers were allowed to consider the evidentiary value of the items in the context in which they were seized. *United States v. Ochs*, 595 F.2d 1247, 1256–59 (2d Cir. 1979); *United States v. Pugh, supra*, 566 F.2d at 637–38. Items like glassware and parsley, which ordinarily appear perfectly innocent, look incriminating when found in an apartment which seems to be used only for the manufacture of drugs. The evidence of a "drug factory" being run on the premises was overwhelming, and it was perfectly reasonable to expect the glassware and the notebooks to be further evidence of the operation. Also, the notebook was evidence which the officers could examine in their attempt to identify the owners or occupants of the premises.

■ Finally, Callabrass claims that the evidence linking him to the conspiracy was insufficient. At trial, the evidence consisted of testimony that he purchased the

---

**3.** Callabrass also argues that because Cassidy was called in to supervise the investigation, his discovery of the evidence was not "inadvertent" within the meaning of the plain view doctrine. *Coolidge v. New Hampshire, supra*, 403 U.S. at 467–71, 91 S.Ct. 2022; *United States v. Ochs*, 595 F.2d 1247, 1257 (2d Cir.

1979). It is, of course, enough that *Shyne's* discovery of the articles was "inadvertent." Once he observed items whose evidentiary nature was apparent, he was entitled to call in help to ascertain their significance and dispose of them properly.

equipment and rented the apartment in a false name, his fingerprints on a beaker near a spray top containing traces of PCP in the Bronx apartment, a note from him to White found outside the Queens apartment, his shirt, containing a bill from the Bronx apartment, found inside the Queens apartment, and testimony that he was observed picking up the equipment from the SGA laboratory. The jury could also consider the credibility (or lack thereof) of the story Callabrass told at trial. *United States v. Rizzuto*, 504 F.2d 419, 420 (2d Cir. 1974). In a line of questioning, the prosecutor first asked if Callabrass was aware of the use of lactose in cutting drugs. When Callabrass answered affirmatively, the prosecutor asked if he had seen large quantities of lactose in the Queens apartment (where it had been seized). Callabrass responded that he had never been inside the house despite the facts that his shirt was found there and that he had rented the apartment and helped move there. On the basis of such evidence, the jury could conclude that appellant had knowingly participated in a conspiracy to manufacture PCP.

The judgment is affirmed in all respects.

OAKES, Circuit Judge (dissenting):

I have great difficulty with the majority's application of *Michigan v. Tyler*, 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978), to this case. That case, in addition to holding proper a morning warrantless reentry by fire officials and a police detective "to investigate the cause of the fire" in a "continuation" of the original entry, *id.* at 510–11, 98 S.Ct. at 1951, also held that additional entries thereafter must be made pursuant to the warrant procedures governing administrative searches, *id.* at 511–12, 98 S.Ct. 1942. In the instant case Detective Cassidy was not called to investigate the cause of the fire, he was called for a drug investigation. True, he found "exigent cir-

cumstances" requiring use of the bomb squad, but his entry was not made with those circumstances in view. I would not reach this question, however, for I think the case may properly be disposed of on other grounds.

Under *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 428, 58 L.Ed.2d 387 (1978), "the extent of a particular defendant's rights under the Fourth Amendment" are defined in terms of "whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." I note that the occupants fled—evidently never to return—from the house which contained exceedingly limited personal property to begin with, most of which was drug-making equipment. For all that appears, the house was uninhabited except as appellant and his codefendants used it as an illegal drug manufacturing laboratory. I also note that, so far as the record on appeal indicates, appellant never returned to the house. To claim their drug-related property, they would obviously not be likely to return at least if the police were anywhere about. Even after three days when Detective Cassidy came back with owner Mercurio's consent they obviously had not returned.

Thus it appears to all intents and purposes that appellant abandoned the house and the property in it. *Cf. United States v. Haddad*, 558 F.2d 968, 975 (9th Cir. 1977) (abandonment of hotel room and belongings in it).[1] This issue is relevant because "[t]here can be nothing unlawful in the Government's appropriation of such abandoned property." *Abel v. United States*, 362 U.S. 217, 241, 80 S.Ct. 683, 698, 4 L.Ed.2d 668 (1960); *see United States v. Smith*, 527 F.2d 692, 696 (10th Cir. 1975); *United States v. Dzialak*, 441 F.2d 212 (2d Cir.), *cert. denied*, 404 U.S. 883, 92 S.Ct. 218, 30 L.Ed.2d 165 (1971). As the Third Circuit has stated, "[o]ne who abandons personal

---

1. *Haddad* like some of the other abandonment cases, *see, e. g., United States v. Cella*, 568 F.2d 1266, 1283–84 (9th Cir. 1977); *United States v. Parizo*, 514 F.2d 52, 55 (2d Cir. 1975), discusses the Fourth Amendment issue in terms of a defendant's standing to raise the issue. Under *Rakas v. Illinois*, 439 U.S. 128, 139, 99 S.Ct.

421, 428, 58 L.Ed.2d 387 (1978), the Court views the discussion as going to the merits of the claim of a Fourth Amendment violation, confident that "no decided cases . . . would have come out differently" if the standing requirement is subsumed under substantive Fourth Amendment doctrine.

property may not contest the constitutionality of its subsequent acquisition by the police." *United States v. De Larosa*, 450 F.2d 1057, 1066 (3d Cir. 1971), *cert. denied*, 405 U.S. 927, 92 S.Ct. 978, 30 L.Ed.2d 800 (1972).

In connection with the Government's challenge to appellant's standing, which with the majority I deem under *Rakas* to be addressed to the merits of the Fourth Amendment issue, the Government calls to our attention the limited nature of appellant's property interest in the house. But the absence of "a recognized property interest at common law" controls neither the issue of the applicability of the Fourth Amendment, *Rakas, supra*, 439 U.S. at 143–44 & n.12, 99 S.Ct. at 430, nor the issue of abandonment. Rather, "[t]he proper test for abandonment is not whether all formal property rights have been relinquished, but whether the complaining party retains a reasonable expectation of privacy in the articles alleged to be abandoned." *United States v. Wilson*, 472 F.2d 901, 902 (9th Cir. 1972), *cert. denied*, 414 U.S. 368, 94 S.Ct. 176, 38 L.Ed.2d 116 (1973); *see United States v. Akin*, 562 F.2d 459, 464 (7th Cir. 1977), *cert. denied*, 435 U.S. 933, 98 S.Ct. 1509, 55 L.Ed.2d 531 (1978); *see also United States v. Parizo*, 514 F.2d 52, 54–55 (2d Cir. 1975); *United States v. Colbert*, 474 F.2d 174, 176 (5th Cir. 1973) (en banc). I note, of course, that under *Rakas* this test is now the relevant inquiry in all Fourth Amendment cases; and I am reinforced in the conclusion that, because the facts of this case present the issue of abandonment, resolution of the case should properly address this issue initially and not treat the legality of Cassidy's entry under *Michigan v. Tyler, supra*.

Abandonment is a question of fact based upon intent, *United States v. Cella*, 568 F.2d 1266, 1283 (9th Cir. 1977); *United States v. Akin, supra; United States v. Colbert, supra; United States v. Cowan*, 396 F.2d 83, 87–88 (2d Cir. 1968); and the question "depends upon all relevant circumstances existing at the time." *United States v. Manning*, 440 F.2d 1105, 1111 (5th Cir.), *cert. denied*, 404 U.S. 837, 92 S.Ct. 125, 30 L.Ed.2d 69 (1971). Accordingly, I would vacate the denial of appellant's motion to suppress and remand to the district court for a hearing on the issue of abandonment; for the district court must make the findings of fact on the issue in the first instance. I would point out, however, that it is not material to a finding of abandonment that Cassidy did not know at the time that he entered the house whether appellant would return; it is sufficient that subsequent events show that appellant had already formulated the intent to abandon the house and the personal property inside. *See Parman v. United States*, 130 U.S.App. D.C. 188, 192–94, 399 F.2d 559, 563–65 (D.C. Cir.), *cert. denied*, 393 U.S. 858, 89 S.Ct. 109, 21 L.Ed.2d 126 (1968); *Feguer v. United States*, 302 F.2d 214, 248–50 (8th Cir.), *cert. denied*, 371 U.S. 872, 83 S.Ct. 123, 9 L.Ed.2d 110 (1962); *cf. United States v. Cowan, supra*. The district court should determine whether and when appellant formulated an intent to abandon because there was "no unlawful invasion of the premises prior to the discovery" of the incriminating matter; and if appellant had abandoned the property "the seizure . . . after discovery required no warrant." *United States v. Wilson, supra*, 472 F.2d at 903.