UNITED STATES of America, Plaintiff,

v.

Rafael PAZ, a/k/a "Quico" and Pedro Garcia, a/k/a "Palaco," a/k/a "Oscar Garcia," Defendants.

No. SS 90 Cr. 0068 (SWK).

United States District Court, S.D. New York.

Dec. 19, 1990.

Otto G. Obermeier, U.S. Atty., S.D.N.Y. by Jonathan Rosenberg, Asst. U.S. Atty., New York City, for the government.

Legal Aid Soc., Criminal Defense Div., Federal Defender Services Unit by Julie A. Prag and Barry H. Berke, New York City, for defendant Rafael Paz.

## MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

The six-count indictment in this criminal case involves allegations of passing counterfeit currency on four occasions, plus conspiracy and firearm counts. Defendant Paz has moved for suppression of evidence seized during his arrest,[1] based on a warrantless entry into his apartment. By Order of September 5, 1990, as amended by on October 15, 1990, the Court granted a hearing on the suppression motion, which was conducted on November 2, 1990.

## BACKGROUND

In early January 1990, a Confidential Informant (hereinafter "C/I", or the "Informant") reported to the United States Secret Service that certain persons were dealing in counterfeit $10 notes in the vicinity of 607 West 190th Street ("the Building"). The Secret Service secured the assistance of the Informant in setting up an undercover "buy." The Informant and a Secret Service Agent ("the Agent") allegedly met with defendants on several occasions to discuss the sale of counterfeit currency.

These conversations were taped. The defendants allegedly made arrangements to sell to the Informant and the Agent $50,-000 in counterfeit $10 bills in exchange for $15,000 real currency.

On January 24, 1990, the Informant and the Agent allegedly again discussed the transaction with defendants in front of the Building. The Secret Service stationed a back-up team of agents in the area. After further negotiation, Mr. Paz allegedly entered the building with the Informant and then emerged with $48,950 in counterfeit bills. Mr. Paz allegedly gave the bills to the Agent in exchange for $15,000 genuine currency.

The Secret Service team then moved in to arrest the dealers. At approximately 6:00 p.m. one agent arrested Garcia on the sidewalk in front of the Building. Tr. 18. The arresting agent called out that Garcia had a gun. Id; Tr. 61. The Agents saw the Informant exiting the Building. The Informant told Special Agent Mooney that Mr. Paz was in Apartment 1B of the Building, and that he believed that another individual was also in Apartment 1B. He further indicated that Mr. Paz was "possibly packing," i.e., in possession of a firearm or weapon. Tr. 61. The Informant also returned to Agent Zimmerman the "flash roll," the stack of bills he was to show to the dealers to convince them that he had the money to consummate the deal.[2] However, the roll was no longer rubber-banded together, but had been unsealed and was simply "a ball of money," or a "fistful." Tr. 19. Agent Zimmerman interpreted this as an indication that "the defendants had gone through the money and were aware that they weren't going to receive their $15,000 in genuine as they had thought." Tr. 18–19.

---

1. Paz also moved to compel disclosure of the identity of the confidential informant who assisted in the arrest. The Court denied that motion.

2. In undercover anti-counterfeiting operations, Secret Service agents apparently prepare a "flash roll," i.e., a stack of bills designed to look like genuine United States currency, but in reality packed with counterfeit notes. During an undercover "buy," the flash roll is shown to a suspect to lead him to believe that the undercover agent has the money he promised to have. Tr. 9. In the instant case, the counterfeit notes in the flash roll were marked "COUNTERFEIT," and were surrounded by four genuine $100 bills on top and bottom. The roll, approximately ¼ to ½ inch thick, was then rubber-banded together so that outwardly it would appear to be a stack of $15,000 genuine currency. Tr. 9–10.

Several agents then proceeded to the doorway of 1B. They did not have a warrant to enter or search the premises or to arrest Mr. Paz. Agent Zimmerman indicated that the strategy was to "knock, identify, and see if either the defendants would let us into the apartment or if they would come out of the apartment to us." Tr. 13. Failing that, he said he intended to secure the apartment and obtain a warrant. Tr. 13. He testified that he repeated those instructions to his agents at the door of Apartment 1B. Tr. 19, 30. This information was independently confirmed by Agent Mooney on the witness stand. Tr. 59, 62.

Agent Mooney testified that when the agents arrived at the door, the apartment door was not completely latched shut. He described the door's position as "maybe an inch or two ajar where you can see the door jamb itself against the light colored paint against the dark door, not where it would be visible but where you would see the door jamb, you knew it wasn't mesh with the door frame itself." Tr. 63. There is some factual discrepancy as to the actual condition of the doorknob, but it is uncontested that it was damaged in some way.[3]

Agent Mooney testified that he identified himself as a police officer and then knocked on the door, approximately one overhanded knock with a closed fist. Tr. 64. Agent Zimmerman also testified that he observed Agent Mooney knock on the door and yell, "Police." Tr. 20. Agent Mooney testified that his knock caused the apartment door to swing open "just under a foot." Tr. 64. Agent Zimmerman's testimony corroborates that the door swung open when Agent Mooney knocked. Tr. 30. However, Mr. Paz swore out an affidavit saying that he heard no knock or announcement prior to the police's entry. Affidavit of Rafael Paz, dated June 12, 1990, (hereinafter "Paz Affidavit"), ¶¶ 3, 4. His "common-law wife," Ms. Rodriguez, also testified that she was in the kitchen cooking at the time and only heard the "noise that the door made when it was broken." Tr. 85.

Agent Mooney and Agent Zimmerman each testified that Mooney then yelled "Police" again, but that he did not enter the apartment at that point. Tr. 30, 79. Mooney testified that from his vantage point he was able to peer into the apartment and get a partial view of Mr. Paz through the bedroom door. Tr. 64. He testified that from that angle he could see doorway of the bedroom and just to the left of the right-hand corner portion of the bedroom. Tr. 64–65. However, Ms. Rodriguez testified that she was never able to see into the first room when standing outside her front door. Tr. 98.

In the doorway Agent Mooney testified that he saw Mr. Paz's head and upper chest, but not his hands. Tr. 65. He further stated that he had eye contact with Mr. Paz, that Paz "looked startled at me and then turned swiftly" out of Agent Mooney's line of vision, into the bedroom. Id. Agent Mooney asserted that he then announced "police" again, entered the apartment and proceeded towards the doorway of the bedroom. Tr. 66.

Agent Mooney testified that upon entering the bedroom, he observed Mr. Paz "scrambling towards the left-hand corner, towards the closet," id., apparently tripping as he ran. Id. Agent Mooney testified that he again identified himself as the police and directed Mr. Paz to stay on the ground. Id. Mr. Paz's version differs in that he alleges the officers "threw me to the floor and put a gun to my head." Paz Affidavit, ¶ 3. Agent Mooney indicated that he then handcuffed Paz, asked his name, and asked him whether he had any weapons, simultaneously patting him down. Tr. 66. Agent Mooney testified that Mr. Paz told him that he kept his gun in his back pocket. Id. Agent Mooney then confiscated the gun and also a beeper found on his person.

Mr. Paz seeks to suppress the evidence seized from him by challenging the constitutionality of the agents' entry into the apartment. The Court now addresses the

---

**3.** The Government maintains that the doorknob was punched out, and there was a circular hole in its place. Tr. 63. Defendant's live-in companion, Lydia Rodriguez, testified that the knob was "a little bad," or "kind of damaged," but that the lock still functioned. Tr. 86–87, 95.

questions of: (1) whether the warrantless search was justified by "exigent circumstances," and (2) whether the police complied with the "knock and announce" requirements of 18 U.S.C. § 3109.

## DISCUSSION

### I. Exigent circumstances

■ The Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects. *Illinois v. Rodriguez,* —— U.S. ——, 110 S.Ct. 2793, 2797, 111 L.Ed.2d 148 (1990) (citing *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) and *Johnson v. United States,* 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948)). The entry is presumptively unlawful unless the Government can prove that the circumstances fit under an exception to the warrant requirement. The exception relied upon here is "exigent circumstances," which attaches if the suspect is about to flee, evidence is about to be destroyed, or life is about to be threatened.

The Second Circuit has adopted the factors set forth in *Dorman v. United States,* 435 F.2d 385, 392–3 (D.C.Cir.1970) (in banc), as "guideposts intended to facilitate the district court's determination of whether exigent circumstances existed." *United States v. MacDonald,* 916 F.2d 766, 769 (2d Cir.1990); *see United States v. Martinez–Gonzalez,* 686 F.2d 93, 100 (2d Cir.1982); *United States v. Crespo,* 834 F.2d 267, 270 (2d Cir.1987), *cert. denied,* 485 U.S. 1007, 108 S.Ct. 1471, 99 L.Ed.2d 700 (1988). The *Dorman* factors have been summarized as follows:

(1) the gravity of violent nature of the offense charged;

(2) whether the suspect 'is reasonably believed to be armed';

(3) 'a clear showing of probable cause ... to believe that the suspect committed the crime';

(4) 'strong reason to believe that the suspect is in the premises being entered';

(5) 'a likelihood that the suspect will escape if not swiftly apprehended'; and

(6) the peaceful circumstances of the entry.

*United States v. Reed,* 572 F.2d 412, 424 (2d Cir.), *cert. denied,* 439 U.S. 913, 99 S.Ct. 283, 58 L.Ed.2d 259 (1978)). The *Dorman* factors are meant to be "illustrative," not "exhaustive":

Sometimes the presence of a solitary factor suffices, *see, e.g., United States v. Gallo–Roman,* 816 F.2d 76, 79–80 (2d Cir.1987) (destruction of evidence), alternatively, a combination of several, *see, e.g., United States v. Callabrass,* 607 F.2d 559, 563–64 (2d Cir.1979), *cert. denied,* 446 U.S. 940 [100 S.Ct. 2163, 64 L.Ed.2d 794] (1980) (destruction of evidence and danger to public).

*MacDonald, supra,* 916 F.2d at 770.

*MacDonald* is a recent Second Circuit elaboration of the exigent circumstances doctrine. In that case, a team of drug enforcement agents was informed that narcotics were being sold in a certain apartment. One agent entered the apartment in order to make an undercover buy. Inside, he saw six men. One man was holding a pistol and one was counting cash. The officer bought $5 worth of marijuana, then returned to the surveillance team outside. Ten minutes later, seven officers entered the apartment without a warrant and arrested five of the men. The agents seized marijuana, cocaine, two guns, and narcotics paraphernalia from the apartment. *Id.* at 768.

On these facts, a 2–1 majority panel in the Second Circuit reversed the District Court's finding of exigent circumstances. It held that defendants were carrying out their "business as usual" and had no notice of police infiltration; the police had no reason to think that the defendants knew of their presence or of the undercover buy. The Court therefore suppressed the fruits of the arrest.

The Circuit Court granted rehearing *in banc.* The Court reversed the divided panel decision and ruled that the evidence should have been admitted under the exigent circumstances doctrine. It noted that the determination of whether a warrantless entry is justified by exigent circumstances

is "an objective one that turns on the district court's examination of the totality of circumstances...." 916 F.2d at 768 (citing *United States v. Schaper*, 903 F.2d 891, 894 (2d Cir.1990); *United States v. Miles*, 889 F.2d 382, 383 (2d Cir.1989) (per curiam); *United States v. Zabare*, 871 F.2d 282, 290–91 (2d Cir.), *cert. denied*, — U.S. —, 110 S.Ct. 161, 107 L.Ed.2d 119 (1989)). Applying the *Dorman* factors, it reinstated the District Court's finding of exigent circumstances. It based its finding on the following factors:

> (1) the grave nature of the ongoing crimes; (2) the presence of loaded weapons; (3) a likelihood that the suspects were themselves using narcotics; (4) a clear and immediate threat of danger to law enforcement agents and to the public at large; (5) not only more than the minimum probable cause to believe, but actual knowledge, that the suspect committed the crime; (6) at least strong reason to believe the suspects were on the premises; (7) a likelihood turned to reality that a suspect might escape if not quickly apprehended; (8) an urgent need to prevent the loss of evidence; (9) the additional time required to obtain a warrant at the late hour of the day; and (10) an attempt by the agents to enter peacefully.

*Id.* at 773.

In the instant case, the Court conducted a suppression hearing, at which Officers Mooney and Zimmerman as well as Lydia Rodriguez testified. Based on *MacDonald*, the Court is prepared to find that there were exigent circumstances permitting the warrantless entry into Mr. Paz's apartment. Many of the ten factors relied upon by the Second Circuit in *MacDonald* are also present here.

The Court finds the following facts, based on the testimony and other documentary evidence received at the hearing as well as affidavits based on personal knowledge.

(1) *Gravity of the Crimes Charged:* The crime of selling counterfeit currency is a felony, punishable under 18 U.S.C. § 472 by up to ten years in prison, although it is not as grave as the ongoing narcotics transactions alleged to have occurred in *MacDonald*.[4]

(2) *Presence of Loaded Weapons:* The Officers had reason to believe that there were weapons present. Mr. Paz's confederate Garcia had just been arrested and found to be in possession of a loaded firearm. Tr. 18, 68. That information was conveyed to the other agents by the arresting officer. Tr. 18. Agent Zimmerman also testified that when the agents encountered the Informant emerged from the Building, the C/I was "extremely upset ... his hands were actually shaking." Tr. 50–51. The Agent concluded that "[h]aving had to confront both defendants with the flash money which he knew was not genuine money, he had come out of the apartment, I am sure, feeling that he had gotten away without being hurt, that he was very lucky." Tr. 51. The Informant at that time conveyed to the Agent Mooney that Mr. Paz was in his apartment with another individual and that they were "possibly packing," which Mooney understood to mean in possession of a firearm or weapon. Tr. 61. The Court deems Agent Mooney's this testimony in this regard to be reliable, on the basis of the witness' demeanor, the detailed character of the testimony, and the independent corroboration by other testimony. In light of the agents' knowledge that Garcia possessed a loaded weapon, in addition to the information provided by the Informant that Mr. Paz and another individual in his apartment were "possibly packing," the agents could reasonably infer that there would be weapons present at Apartment 1B.

(3) *Likelihood of Narcotics Use:* Nothing on the record indicates that this factor was present in the instant case.

(4) *Clear and Immediate Threat of Danger:* The Agents could have reason-

---

**4.** The weapon count, possession of a firearm by a convicted felon, while grave indeed, is charged only against defendant Garcia.

ably concluded that there was an imminent threat of danger. Agent Mooney testified, and nothing in Mr. Paz's affidavit contradicts, that when the apartment door opened, the two men made eye contact, and that Mr. Paz "looked startled at [Mooney] and then turned swiftly" out of Mooney's line of vision, into the bedroom. In light of the evidence, *ante,* suggesting that firearms may have been present, the agents were justified in their concern that their own safety and that of others in the household, including Mr. Paz himself, might be in jeopardy.

However, before the Court can accept this information as a basis for satisfaction of this aspect of "exigent circumstances," the Court must be satisfied that Agent Mooney's view of Mr. Paz through the partially-opened door was properly obtained. That question in turn requires resolution of the factual question of whether the door swung open as a result of the knock, as Agents Mooney and Zimmerman testified, or whether it was "torn down," as indicated at times by Ms. Rodriguez. *See, e.g.,* Tr. 86.

The Court has no difficulty resolving this question in favor of the Government. Agent Mooney, who did the actual knocking, testified clearly, credibly, and in a detailed fashion about the knock itself and the exact position of the door before and after the knock. *See* Tr. 63, 64. Agent Zimmerman independently corroborated Agent Mooney's testimony that the door swung open upon the impact of the knock. Tr. 30.

To the contrary, Ms. Rodriguez variously testified that the door, the door frame, and/or the wall around the door were "destroyed" and "torn" as a result of the force of the officers' entry. Tr. 85. The Court finds her not to be a credible witness, as she seemed to have trouble understanding Counsel's questions, even with the aid of the Spanish interpreter, and when she did answer them, she contradicted herself within the space of a very short time. The

Court notes, for example, the following exchange:

> Mr. BERKE (Defendant's Counsel): Did you have occasion to look at the door after they [the agents] left the apartment?
>
> The WITNESS: It was destroyed. It was very damaged. It was all broken.
>
> Q. Can you describe in what way it was damaged?
>
> A. The door?
>
> Q. Yes.
>
> A. The door was not damaged. It is just like the knob was kind of damaged.
>
> Q. I am sorry. When you examined the door, the door frame after the people left the apartment, what if anything did you notice?
>
> A. Oh, it was destroyed because they just tore it down.

Tr. at 85–86.

Similarly, defendant's counsel presented to Ms. Rodriguez a series of photographs of the door area in order to elicit her testimony about the force of the officers' entry:[5]

> Q. What is that a picture of? (Indicating Defendant's Exhibit C 3)
>
> A. That is the door.
>
> Q. Is that what the door looked like on January 24?
>
> A. After they broke it.
>
> Q. Have there been any repairs on that door since that day which is reflected in the picture?
>
> A. No. He just put some things in the door like some nails, that's it.
>
> Q. There were some repairs?
>
> A. No, but not much, just barely what is in there.

Tr. 91. This contrasts with the witness' prior testimony, in which she stated that the door frame "was destroyed because they just tore it down ... the [wall around the door] was all torn ... before it was fine." Tr. 86. In addition to the self-contradictory and confused character of this witness' testimony, the Court also notes that her testimony may be tainted by interest or bias because of the nature of her

---

5. The Court does not credit the pictures as reflecting the condition of the door on January 24, 1990, since they were taken in November 1990, over nine months later.

relationship with the defendant, *i.e.*, they have lived together for about ten years and have two children together. *See* Tr. 97. Accordingly, the Court does not credit this witness' testimony, to the extent that it differs from that of the agents.

Defense counsel also attempted to use Ms. Rodriguez's testimony for purposes of demonstrating that she "normally" keeps her door locked, Tr. 86, and that the apartment door had a spring device on it. Defense Exhibits C-2, C-3; Tr. 90-92. Presumably the point of eliciting this testimony was to impeach the agents' testimony that the door swung open when Agent Mooney knocked on it. The Court has already expressed its reservations about the probity of the photographs and the reliability of Ms. Rodriguez's testimony. Even if it were to credit the photographs and Ms. Rodriguez's testimony,[6] however, there is not necessarily an inconsistency between Agent Mooney's description of the position of the door and the presence of a spring mechanism. Depending on the size, strength and age of the spring, such a device would not necessarily close the door all the way to the latched position, and would not necessarily impede it from swinging open by "just under a foot" when knocked upon.

Accordingly, the Court concludes that the agents testified truthfully about their procedures upon arriving at the portal of Apartment 1B, that Agent Mooney did not act improperly in peering into the apartment to see what he could see from the outside, and that his observations gave rise to reasonable fear of imminent threat to the safety of law enforcement agents and others in the household. Therefore, the facts of this case resemble those of *MacDonald* in this regard as well.

(5) *Probable Cause to Believe that Mr. Paz Committed the Crime*

■ Just as in *MacDonald*, in the instant case the agents had "not only probable cause to suspect that a crime had been perpetrated but firsthand knowledge," at the time of the entry, that the suspect committed the crime. 916 F.2d at 769. The Informant had advised the agents weeks before the date of the arrest that these individuals were involved in counterfeiting. After several meetings, he set up a "buy" for January 24, 1990. These conversations were taped. On January 24th, the Informant and the agents, including one agent acting undercover, proceeded to the site of the sale and allegedly carried out the planned buy. The undercover agent gave the audio signal, which was received by both Agents Zimmerman and Mooney, that he had obtained the counterfeit from defendants Paz and Garcia. Tr. 16, 60. Agent Zimmerman also received independent confirmation from the undercover agent that the deal had been completed. Tr. 17.

Upon this uncontradicted and wholly credible testimony, the Court is prepared to conclude that the agents had more than probable cause to believe that the person(s) inside the apartment had just participated in the illegal currency transactions.

(6) *Reason to Believe the Suspect was on the Premises.* The Agents also had strong reason to believe that Mr. Paz was on the premises of Apartment 1B. The Confidential Informant personally informed Agent Zimmerman when they met outside the Building that Rafael Paz and possibly another individual were in the Paz apartment. Tr. 19. Agent Mooney also reports that the Informant conveyed the same information to him. Tr. 61. The testimony of each corroborates that of the other, and together are sufficiently reliable for the Court to conclude that the agents had strong reason to believe that Mr. Paz and possibly another co-conspirator were on the premises of Apartment 1B.

■ (7) *Likelihood of Escape.* The Agents could have reasonably concluded that Mr. Paz might escape if not quickly apprehended. His apartment was on the ground floor, with windows facing the street. This situation made it likely that Mr. Paz might try to escape, for two inde-

---

**6.** Ms. Rodriguez did not specifically testify that the door could not have swung open despite the presence of the spring, nor did she testify that the door was locked on that particular occasion.

pendent reasons: first, because he would have easy exit from the apartment without using the door; and second, because he may have been able to observe the arrest of his alleged co-conspirator Garcia, which apparently took place in the vicinity of his window.[7] The Court notes another reason why the agents might have concluded that Mr. Paz would attempt to flee at that point: the "flash roll" had been disassembled, from which the agents concluded that the alleged conspirators had discovered that they were dealing with an undercover agent and/or informant.

On the other hand, the vicinity of 607 West 190th was under surveillance by a total of ten agents during the course of the afternoon's events, Tr. 21, including one in the vestibule of the Building, Tr. 62, and three at the door of Apartment 1B. Tr. 29. *See* Letter of Julie Prag, Esq., Counsel for Rafael Paz, dated July 12, 1990, at 2. The fact that the surveillance operation was already in place for the duration of the buy made it perhaps less likely that Mr. Paz would have been successful had he attempted to flee. However, no degree of coverage is infallible; and because of the approach of nightfall[8] the agents could have reasonably feared that Mr. Paz could escape without notice. Had Paz done so, the agents may well have been concerned for the safety of the Informant; as previously noted, *see ante*, ¶¶ (2) and (4), Mr. Paz, who may have been armed, had possibly discerned the true role of the Informant as well as the undercover agent when the flash roll was unsealed.

Under all the facts and circumstances going to this issue, the Court determines that the officers reasonably concluded that Mr. Paz was likely to flee if they did not arrest him immediately.

(8) *Need to Prevent Loss or Destruction of Evidence.* Under cross-examination by defense counsel, Agent Zimmerman acknowledged that he did not believe that

there was equipment on the premises of Mr. Paz's apartment for the manufacture of counterfeit currency. Tr. 34–37. Agent Zimmerman also acknowledged that the transaction involved no pre-recorded buy money. Tr. 37. However, Agent Zimmerman did testify on redirect that he had reason to believe, based on tape recordings of alleged earlier transactions between the Informant and Mr. Paz, that there may have been other evidence of counterfeiting in Mr. Paz's home. Agent Zimmerman specified that based on tape recorded conversations between Mr. Paz and the Informant, he believed that Mr. Paz might have kept chemicals in his apartment for the treatment of the counterfeit currency paper, and also that Mr. Paz possibly maintained a larger supply of counterfeit money in his apartment. Tr. 49–50.

On the other hand, Paz points out that Agent Zimmerman testified at his grand jury appearance that "at the time [of the arrest] we didn't have information leading us to believe that we needed a search warrant for Paz's residence." Tr. at 36. Therefore, Paz asks the Court to find that Agent Zimmerman's concerns about the loss of evidence are "newfound and without any basis in fact." Letter of Julie A. Prag, Esq., dated November 19, 1990, at 3.

Upon this record, the Court is unable to make any finding as to whether the officers feared destruction of the evidence at the time they made their entry into the apartment.

(9) *Time Required to Obtain a Warrant.* Agent Zimmerman testified that he had not had personal experience obtaining a warrant over the telephone, and was thus personally unaware of how long that process would take. However, upon further questioning, he indicated that in a different investigation he had been with another agent who had obtained a telephone warrant. In his experience in that investiga-

---

7. The windows of one or more of the rooms in Apartment 1B look out onto the sidewalk in front of the building. Tr. 47. It was near one of those windows that Garcia was placed under arrest. Tr. 51. Accordingly, it is reasonable for the agents to have concluded that Paz may have been able to see Garcia being arrested outside of his window. Tr. 51.

8. The events began taking place at 5:00 p.m., and the arrest of Garcia took place at 6:00 p.m. The Court takes judicial notice that, by that hour during the month of January, it is fairly dark outdoors.

tion, the procedure took approximately two hours. Tr. 45–46. As the Second Circuit noted in *United States v. Campbell*,

> to secure a warrant would have required the police and agents to wait at least several more hours until the facts were fully communicated to headquarters, typed in affidavit form, attested to, presented to one of the district's busy magistrates, and a warrant obtained in due course.

581 F.2d 22, 26–27 (1978).[9] In light of the agents' concern that Mr. Paz might attempt to flee, it is not unreasonable for them to have concluded that waiting for a telephone warrant would have jeopardized the agents and others, as well as the evidence.

(10) *The Agents' Attempt to Enter Peacefully.* As related independently by Agents Zimmerman and Mooney, Agent Zimmerman stressed to his team that they were to attempt either to coax Mr. Paz out of his apartment, or secure Paz's permission to enter. Tr. 13, 19, 30, 59, 62. When they did enter, it was with a knock and announcement, followed by entry through a door that was already partially open.[10] Accordingly, the Court circumstantially infers that the agents both intended and attempted to enter peacefully. Under the circumstances, the Court finds that the officers' entry into apartment 1B was intended to be, and was in fact, relatively peaceful.

Under the totality of circumstances, there were exigent conditions sufficient to overcome the warrant requirement of the Fourth Amendment. The most persuasive circumstances in favor of the warrantless entry, in this Court's view, were the Informant's return of the disassembled "flash roll"; Garcia's arrest in the vicinity of Mr. Paz's ground-floor window; and Agent Mooney's eye contact with Mr. Paz through the partially open door. These events made it reasonable for the agents to conclude that Mr. Paz had become aware of

police presence and of his imminent arrest. *See U.S. v. Campbell*, 581 F.2d 22 (2d Cir.1978) (exigent circumstances where officers had reasonable grounds to believe that two defendants may have been informed of arrest of their co-conspirator or surmised the same from his absence). Moreover, the Informant's conveying of the information that Mr. Paz and another individual were in Apartment 1B and that they were "possibly packing," heightened the officers' perception of the danger of an armed confrontation. It was therefore permissible for the agents to have entered Apartment 1B without a warrant under the "exigent circumstances" doctrine.

The motion to suppress the evidence seized from Mr. Paz pursuant to the warrantless arrest, including a pistol and a beeper, is denied.

## II. "Knock and announce" requirement

▮ Having found sufficient exigent circumstances to justify the warrantless arrest, the Court must next determine whether the agents satisfied the statutory "knock and announce" requirement. That statute provides that

> the officer may break open any outer or inner door or window of a house, or any part of a house, or authority therein to execute a search warrant, if after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of a warrant.

18 U.S.C. § 3109.

The Government points out that the knock and announce requirement is not triggered if the door is open in the first place. *United States v. Morell*, 524 F.2d 550, 556–57 (2d Cir.1975). Agents Mooney and Zimmerman have credibly testified that the door was ajar.

Moreover, the Court has already credited Agents Mooney's and Zimmerman's testimony that Mooney knocked once and announced his authority three times before

---

9. In a footnote, the Court credited testimony by the agent that such a procedure would take four to five hours. *Id.* at n. 7.

10. The Court has already indicated that it credits the agents' mutually corroborative accounts of the circumstances of the entry, as against that of Ms. Rodriguez.

entering the apartment. Under these circumstances, Mr. Paz's and Ms. Rodriguez's assertions that they never heard such a knock or announcement present little challenge to that testimony.[11]

The Court concludes that the mandate of § 3109 does not apply, or in the alternative, that it was fulfilled by the actions of the Agents at the apartment door.

## CONCLUSION

For the aforementioned reasons, defendant Paz's motion to suppress evidence is hereby DENIED.

SO ORDERED.

---

**11.** Even if credible, this testimony is not necessarily inconsistent with that of the agents. Rodriguez was preparing dinner in the kitchen with one of her children, and Paz was in or near the back bedroom. Accordingly, it is perfectly possible that neither of them heard the knock or announcement.