**UNITED STATES of America**

v.

**Gregory Clifford CLARK.**

**Crim. No. 85–00077.**

United States District Court,
E.D. Pennsylvania.

Sept. 10, 1985.

694

Edward S.G. Dennis, Jr., U.S. Atty., Linda Dale Hoffa, Asst. U.S. Atty., Philadelphia, Pa., for plaintiff.

Jay S. Gottlieb, Philadelphia, Pa., for defendant.

## MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

■ The indictment in this case charged the defendant, Gregory Clifford Clark, with manufacturing methamphetamine (Count I) and phenyl-2-propanone (P2P) (Count II) on or about July 11, 1985, in violation of 21 U.S.C. § 841(a)(1). After a trial lasting four days, the jury returned a verdict of guilty on both counts. At oral argument on the defendant's post-trial motions for judgment of acquittal and/or a new trial, the Court denied the motions with respect to all but one of defendant's allegations of error, which the Court reserved for written disposition. The Court now considers defendant's motion for a new trial on the ground that the Court erred in failing to suppress evidence seized from defendant's property. At the outset, the Court notes that a motion for a new trial pursuant to Fed.R.Cr.P. 33 must be granted if there is a substantial probability that trial error could have had a substantial influence on the jury's decision. *See Government of Virgin Islands v. Bedford*, 671 F.2d 758, 762 (3d Cir.1982); *United States v. Mastro*, 570 F.Supp. 1388, 1390 (E.D.Pa.1983). For the reasons discussed below, the defendant's motion for a new trial will be denied.

Just after midnight in the early morning of July 11, 1985, Chester County firemen responded to a report of smoke observed by the resident of 1427 James Place, Ruth Dixon. The firemen were accompanied by one police officer, in accordance with a routine practice designed for the firemen's protection. After finding no fire or source of smoke at 1427 James Place, the firemen observed smoke coming from the rear of 1429 James Place, an adjacent rowhome, through an open kitchen window. After having knocked and received no response, the firemen and one policeman entered the premises through the kitchen door.

Upon entering the premises, the firemen and policeman observed incense and punks burning in the kitchen, and noted a sweet odor and a light smoky haze in the air. They also saw mail addressed to the defendant inside two open briefcases on the kitchen counter. The firemen checked the second floor for victims, smoke, and any burning items. They found a light odor and no smoke. Following the smoke, they proceeded back to the first floor to the basement stairway, where they observed a casserole dish containing a bubbling liquid on or near the top step. The men went down into the basement, where the smoke and odor intensified, and where they discovered materials indicating the presence of a clandestine methamphetamine laboratory: a pressure cooker and tubing, hot plates which had been turned on, dry ice, large quantities of various chemicals used in the manufacture of methamphetamine and P2P, several containers filled with chemical solutions, laboratory glassware, and protective gloves. The solutions were later determined to be in various stages of P2P and methamphetamine synthesis, including P2P and pure methamphetamine. The amount of precursor chemicals was later determined to be enough to produce about twelve pounds of methamphetamine.

The policeman and fire captain told the firemen on the scene that this was an apparent drug laboratory. The fire captain extinguished some burning punks and told the men not to touch anything. Neither the firemen nor the police officer accompanying them was trained for dismantling laboratories. It was well known to them that the properties of the chemicals in clandestine methamphetamine and P2P labs, such as acetone and ether create a risk of explosion or fire, and that some of the chemicals are toxic. Therefore, the fire crew's practice was to call for trained assistance in disassembling such labs. The policeman on the scene at 1429 James Place called a second police officer to the scene. They did not touch the laboratory, but contacted the police dispatcher to request the assistance of narcotics officers. The first narcotics officer arrived at about 1:00 a.m.,

viewed the lab and noted the chemical odor, and directed the firemen to take the bubbling casserole dish which was found on the stairway landing out of the house. The firemen ventilated the house, and then stayed outside until the lab was disassembled, in case there was an explosion or fire. The narcotics investigator felt that the recently "cooking" lab and large quantities of chemicals presented a highly dangerous situation. Therefore he called William Glanz of the Drug Enforcement Agency (DEA) and Richard Conway, the head of the Chester County Police Department Narcotics Squad, whose expertise was greater than his, to the scene. Narcotics Officer Conway arrived in 15 minutes, and Agent Glanz arrived in 30 minutes. After the two experts arrived, they supervised the disassembly of the lab, which took approximately 4½ hours. The lab equipment and chemicals were seized and secured in 2 police vans until the arrival of additional DEA agents. During this time, Officer Conway went to the second floor of the house to see if anyone was in the house and to look for any additional chemicals and incense. Officer Conway saw various items of identification belonging to the defendant as well as certain bills addressed to the defendant at 1429 James Place, on top of the bureau in a bedroom. In addition, Officer Conway observed men's toiletries, men's clothing, and no women's clothing or accessories.

■ The defendant contends that the Court erred in failing to suppress the evidence seized at 1429 James Street in Chester, Pennsylvania on July 11, 1984. The Court found and the defendant acknowledges that the initial entry by the firemen and one policeman was for the purpose of extinguishing a fire, and that this initial warrantless entry was justified by the exigency of the circumstances. *See Michigan v. Clifford,* 464 U.S. 287, 104 S.Ct. 641, 78 L.Ed.2d 477 (1984); *Michigan v. Tyler,* 436 U.S. 499, 501, 98 S.Ct. 1942, 1945, 56 L.Ed.2d 486 (1978).

Because the firemen and policeman were lawfully on the premises of 1429 James

Street, and because they inadvertently discovered the methamphetamine lab while seeking the source of the smoke, they were justified in seizing the laboratory items which were in plain view. *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) and its progeny including *Texas v. Brown,* 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) and *Illinois v. Andreas,* 463 U.S. 765, 103 S.Ct. 3319, 77 L.Ed.2d 1003 (1983) hold that "[t]he plain view doctrine authorizes seizure of illegal or evidentiary items visible to a police officer whose access to the object has some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with some criminal activity." *Andreas,* 103 S.Ct. at 3324. This probable cause standard requires only a practical, commonsense probability that incriminating evidence has been found. *Brown,* 103 S.Ct. at 1542–43. Furthermore, the incriminating nature of the evidence need not be apparent at first glance if it becomes "apparent without other information than that which the officers possessed before the search was over." *United States v. McDonald,* 723 F.2d 1288 (7th Cir.1983) (further citations omitted). *See also United States v. Callabrass,* 607 F.2d 559, 564 n. 3 (2d Cir.1979) (it is sufficient if one officer's discovery of the articles was inadvertent and their evidentiary nature was apparent; it was not significant that a second officer helped the first to identify and seize the articles).

At oral argument, defense counsel had to concede that the discovery of the laboratory by the firemen and accompanying policeman was inadvertent and that they were entitled to seize the laboratory under the plain view doctrine. However, defense counsel argued that once the fire crew determined not to touch anything and that this was a matter for the police, the arson and narcotics agents who were called in were obligated to obtain a criminal search warrant based on probable cause. Defense counsel also contends that Narcotics Officer Conway was not authorized to be in the kitchen or to go to the second floor of the house, and that therefore the identification

evidence which was in plain view in the kitchen and in the upstairs bedroom should have been suppressed.

Defendant relies on the following language from the Supreme Court's plurality opinion in *Michigan v. Clifford,* supra:

If the primary object of the search is to gather evidence of criminal activity, a criminal search warrant may be obtained only on a showing of probable cause to believe that relevant evidence will be found in the place to be searched. If evidence of criminal activity is discovered during the course of a valid administrative search, it may be seized under the "plain view" doctrine. *Coolidge* .... This evidence then may be used to establish probable cause to obtain a criminal search warrant. Fire officials may not, however, rely on this evidence to expand the scope of their administrative search without first making a successful showing of probable cause to an independent judicial officer.

The object of the search is important even if exigent circumstances exist. Circumstances that justify a warrantless search for the cause of a fire may not justify a search to gather evidence of criminal activity once that cause has been determined .... A search to gather evidence of criminal activity *not in plain view* must be made pursuant to a criminal activity upon a traditional showing of probable cause.

104 S.Ct. at 647. (emphasis added).

To the extent that *Clifford* is a fire-arson investigation case, it is not apposite to the facts of the present smoke-drug lab dismantling case. Furthermore, this Court is of the opinion that defendant's argument misses the "exigency" rationale behind the fire exception to the warrant requirement which the Supreme Court recognized in *Clifford* and *Tyler, supra.*

In *Tyler,* the Supreme Court held that a burning building is an exigency justifying a warrantless entry to extinguish the fire:

Our decisions have recognized that a warrantless entry by criminal law en-

forcement officials may be legal when there is compelling need for official action and no time to secure a warrant. *Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (warrantless entry of house by police in hot pursuit of armed robber); *Ker v. California,* 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (warrantless and unannounced entry of dwelling by police to prevent imminent destruction of evidence)....

A burning building clearly presents an exigency of sufficient proportion to render a warrantless entry "reasonable." Indeed, it would defy reason to suppose that firemen must secure a warrant or consent before entering a burning structure to put out the blaze. And once in a building for this purpose firefighters may seize evidence of arson that is in plain view. *Coolidge....*

436 U.S. at 509, 98 S.Ct. at 1949–50. The *Tyler* Court further held that the exigency justifying a warrantless entry to fight a fire does not end with "the dousing of a flame." 436 U.S. at 510, 98 S.Ct. at 1950. The Court held that fire officials may remain in a building for a reasonable time to investigate the cause of a blaze after it has been extinguished. *Id.* The search, which began after the fire was out and which was continuous except for a four hour interruption caused by smoke and darkness, was justified in order to prevent recurrence of the fire and to preserve evidence from accidental or intentional destruction.

In *Michigan v. Clifford,* the Supreme Court held that in the case of a personal residence, an investigation into the cause of a fire which was not a continuation of the initial legitimate warrantless entry to fight the fire was unconstitutional. The search in *Clifford* was not initiated until six hours after the fire had been extinguished and the firemen had left, and during that interval the owners had taken steps to secure the house. As the *Clifford* Court expressly noted, the state did not attempt to justify the post-fire search on the basis of exigent circumstances.

Neither *Clifford* nor *Tyler* can directly control the present case because in this case there was no actual fire. The exigency caused by the existence of large quantities of potentially explosive chemicals and a recently "cooking" lab inside the rowhouse at 1429 James Place was not "extinguished" by the fire department. The exigency required dismantling of the clandestine lab, and this justified summoning experienced narcotics agents to handle that disassembly. A closer case than *Tyler* or *Clifford* is *United States v. Callabrass, supra,* in which the Second Circuit held that a narcotics agent could be called in after a fire to dismantle a phencyclidine lab:

A prompt investigation was required in *Tyler* to "preserve evidence from intentional or accidental destruction." [436 U.S.] at 510, 98 S.Ct. at 1950. Here the need was at least as great since many of the substances found in the apartment were volatile.... Regardless of what [the narcotics agent] Cassidy hoped to accomplish by seizing the evidence, prompt action was required to secure items easily prone to accidental or intentional destruction.... The need for prompt removal of the substances found on the premises is not belied by the lapse of time between their discovery and Cassidy's arrival.... We cannot imagine that the Fourth Amendment required either that Cassidy obtain a warrant before moving the chemicals or that the officers who first arrived dispose of the chemicals despite their lack of expertise.

607 F.2d 559, 564. Justice Stevens, the concurring Justice in *Clifford,* stated that the *Tyler* and *Clifford* rules applied only to post-fire investigations which could not be supported on an emergency rationale." 464 U.S. at —— n. 4, 104 S.Ct. at 651 n. 4. Justice Stevens noted that a majority of the Court would dispense with the warrant requirement if there were a danger of rekindling. The chemical dangers present in this case and in *Callabrass* constitute exigent circumstances which were at least the equivalent of a danger of rekindling.

Once Narcotics Officer Conway was legitimately on the scene, he was entitled to seize the laboratory items in plain view. The existence of the methamphetamine-P2P lab in the basement made the mail which was in plain view in the kitchen evidentiary. The seizure of the bills *on top* of the open briefcases was justified by the plain view doctrine. The Court allowed only the evidence which was visible on top of the open briefcases, and suppressed the contents of the briefcases which were not in plain view.

■ Narcotics Officer Conway was also authorized in going to the second floor in order to search for people and additional chemicals and/or smoke. This search was justified by the need to remove any additional hazardous chemicals which may have been stored there. Furthermore, a P2P-methamphetamine lab had been found in operation and a bubbling casserole dish was discovered at the top of the stairs to the main floor. This scenario was strongly suggestive of the fact that the responsible chemist had fled the basement, possibly for another part of the house. This indication analogizes the situation to one of "hot pursuit", and "the possibility that the unapprehended ... [methamphetamine-P2P chemist] remained within the house supplied sufficient exibent circumstances to justify the officers in ... searching for the individual...." *United States v. Stubblefield*, 621 F.2d 980, 982 (9th Cir.1980) (further citations omitted).

Once Officer Conway was legitimately in the upstairs bedroom, he was entitled to seize the incriminating identification evidence which he inadvertently found in plain view. The Court permitted the use of items found on the top of the dresser only, and suppressed items found within the dresser drawers.

For the reasons discussed above, there was no error in failing to grant defendant's motion to suppress the evidence seized from 1429 James Place.

■ The defendant took the stand and testified that 1429 James Place was not his residence at the time in question. Therefore, the Assistant United States Attorney (AUSA) was entitled to cross-examine the defendant about all of the personal papers and identification belonging to the defendant which were found at the premises. If the defendant denied leaving any of the particular items at 1429 James Place, the AUSA was entitled to introduce that paper as impeachment evidence, even if it was among the papers held inadmissible in the government's case-in-chief. *United States v. Havens*, 446 U.S. 620, 624–29, 100 S.Ct. 1912, 1915–17, 64 L.Ed.2d 559 (1980); *Walder v. United States*, 347 U.S. 62, 65, 74 S.Ct. 354, 356, 98 L.Ed. 503 (1954). The Court sustained defense counsel's objection to the form of one question in which the AUSA identified the birth certificate, a suppressed paper, in putting the question to the defendant. The Court ruled that the AUSA could ask the defendant generally what papers he had left at 1429 James Place, without identifying the particular piece of suppressed evidence to which she was referring. If the defendant did not remember which papers he had left, the Court ruled that the AUSA could show the suppressed paper to the defendant to refresh his recollection. Only if the defendant still could not remember or if he denied leaving the suppressed papers at the premises would the Court allow the AUSA to identify and to introduce the paper into evidence. These rulings were fully consistent with *Havens* and *Walder* and fully protective of defendant's rights. The AUSA complied with the Court's ruling. There was no prejudice attributable to the fact that in one question the AUSA identified one suppressed paper in the question. There is no basis in the record for a new trial based on improper impeachment by suppressed evidence.