**UNITED STATES of America, Appellant,**

**v.**

**Edward BOETTGER, Appellee.**

**No. 94–2884.**

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 10, 1995.

Decided Dec. 13, 1995.

Linda Lipe, Assistant U.S. Attorney, argued, for appellant.

Larry Dean Kissee, Ash Flat, Arkansas, argued, for appellee.

Before RICHARD S. ARNOLD, Chief Judge, BRIGHT and MURPHY, Circuit Judges.

DIANA E. MURPHY, Circuit Judge.

The government appeals from the district court's order suppressing evidence seized during a warrantless search of appellee Edward Boettger's apartment. The government argues that the danger of explosive materials present in Boettger's apartment was an exigent circumstance justifying the search. We agree and reverse.

**I.**

Shortly after 9:00 p.m. on the evening of February 8, 1993, the Lake Village Fire Department was called to investigate an explosion at Bush Apartments. The first officials to arrive at the scene were Fire Chief Larry Donaldson and Police Detective Bob Graham. After they arrived sometime before 9:30 p.m., Boettger told Donaldson he had been making a firecracker in his apartment; he told Graham that there had been a chemical explosion. Soon thereafter, Boettger—who had lost one hand and a couple of fingers—was taken to a hospital. A neighbor had kicked in the door of his apartment to help him escape, and Boettger twice asked him to shut the door behind him.

Donaldson and Graham entered the apartment and looked around but were unable to find the cause of the explosion. There was no evidence of a fire in the apartment, only smoke. As the smoke cleared and Donaldson could see more of the apartment, he determined that the explosion came from the kitchen, which was littered with parts of Boettger's missing hand and fingers. Also in the kitchen was a crockpot with small containers filled with a clear liquid. The oven was not the source of the explosion; the oven door, however, had been blown apart by the impact of the explosion. They saw a trail of blood leading from the kitchen to the bathroom and a still-type device with coiled wires in the back room. After they found what appeared to be a bomb in the form of a small glass bottle with a fuse on top, they quickly evacuated the apartment.

They then contacted an Arkansas State Police officer who arrived shortly before 11:00 p.m. He also realized within several minutes that he could not identify the nature of the glass bottle or ascertain the possible danger of other chemicals which might be present. He left the apartment to consult with the local officials, and at his suggestion they decided to call the Bureau of Alcohol, Tobacco and Firearms (ATF) in Little Rock for assistance. Lake Village is in the southeastern corner of Arkansas, about two to three hours drive from Little Rock.

That same night, February 8, officials evacuated all three buildings of the apartment complex. Detective Graham testified that he believed no one from the three buildings was allowed back until about 2:30 p.m. on February 10.

Two ATF agents arrived from Little Rock around noon on February 9. They were told by Detective Graham about a conversation he had had that morning around 3:30 a.m. with a medical technician who reported that Boettger had stated he had been drying a mixture of aluminum substance, red sulphate, and bromide. The ATF agents walked

through the apartment for about five to ten minutes. Although one was explosives-certified, neither knew how to handle the potential bomb by the door nor how to deal with the liquids, condensing coils, or other chemicals they believed to be present.

The agents called the ATF explosive technology branch in Atlanta, Georgia, and spoke with Terry Byer, an explosives expert with over 20 years experience as a master explosive disposal technician in the U.S. Navy. The Little Rock agents told Byer that red phosphorus, perchlorate, chlorate derivatives, and aluminum powder were believed to be present in Boettger's apartment.[1] After hearing a description of the situation, Byer advised the agents that it was potentially very hazardous, that they should keep the area secure, and not allow anyone to go into the structure. The agents also called Bill Buford, the resident agent in charge in Little Rock, who instructed them to leave the residence immediately and to make sure that all of the buildings around the residence remained evacuated until someone familiar with chemical compounds could insure that it was safe to go back into the area. The agents followed these instructions and waited outside the apartment for the explosive experts to arrive.

Byer took the first flight from Atlanta and arrived in Lake Village with Bill Buford and an Arkansas State Police bomb technician around 8:40 p.m. on February 9. It was dark by this time, and further search was postponed until morning because, Byer testified, any light could have generated a spark and ignited the chemicals, which were "never, never safe." Buford testified that the chemicals were so extremely sensitive that "merely walking across the floor" could have caused an explosion, and it was thus "extremely dangerous" for anyone without proper knowledge to be around them. Byer also feared booby traps amidst the trash and debris littering the apartment.

At 8:00 a.m. on February 10 Byer reentered the apartment and began the search for any devices and chemicals that might form explosive compounds. Officials took the precaution of wearing gloves and nonsparking soles on their shoes. Buford testified that their main concern was that "someone, anyone, going into that residence or around that residence could be injured by the chemical materials that were on the inside." In addition to the glass jar with the fuse, agents seized two cardboard containers containing perchlorate explosives, seventeen firecracker type explosive powders sealed inside paper tubes, two metal pipes and two polyvinyl chloride pipes used to construct destructive devices, and a firearm silencer. Due to the trash in the apartment, officials uncovered many of these items by sifting through several layers of books, papers, and debris. Once the explosives were removed from the apartment, all searching stopped.

Boettger was indicted in three counts, for making 25 destructive devices, possessing 25 destructive devices, and possessing an unregistered firearm silencer. The district court found that each warrantless entry and search was valid, except for the morning search on February 10, which it concluded was conducted primarily to gather evidence for prosecution. It therefore suppressed 24 of the 25 destructive devices, the firearm silencer, and photographs taken during the February 10 search.

## II.

 It is not contested that no attempt was ever made in this case to get a warrant. The Fourth Amendment does not require that a warrant be obtained in every case. "Nevertheless, one governing principle, justified by history and by current experience, has consistently been followed: except in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant." *Camara v. Municipal Court*, 387 U.S. 523, 528–29, 87 S.Ct. 1727, 1730–31, 18 L.Ed.2d 930

---

**1.** Boettger argues that the expressed safety concerns were not justified because he had told the medical technician that he had been mixing red sulphate, not red phosphorus. There is no suggestion that the agents deliberately misstated what they believed to be present, however, and there is evidence that they believed several other dangerous chemicals were also in the apartment, justifying a reasonable belief that another explosion could occur.

(1967). One such exception is that for exigent circumstances.

The Supreme Court has considered the exigent circumstances exception to the warrant requirement in relation to entries on fire-damaged property in *Michigan v. Tyler*, 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978), and *Michigan v. Clifford*, 464 U.S. 287, 104 S.Ct. 641, 78 L.Ed.2d 477 (1984). These cases show that a dangerous situation may justify reasonable warrantless entries and searches.

■ In *Tyler*, the Court held that no warrant is needed where officials are investigating "for a reasonable time" the cause of a fire after it has been extinguished, and evidence discovered during such investigation is admissible. 436 U.S. at 510, 98 S.Ct. at 1950. What is "a reasonable time to investigate" must be determined by recognizing "the exigencies that confront officials serving under these conditions, as well as to individuals' reasonable expectations of privacy." *Id.* at 510 n. 6, 98 S.Ct. at 1950 n. 6. The Court recognized that circumstances of the individual situation "will vary widely," and when a fire spreads through a large apartment complex, it may be necessary for officials to "remain on the scene for an extended period of time repeatedly entering or re-entering the building or buildings, or portions thereof." *Id.*

The exigent circumstance identified in *Tyler*—the need to protect public safety by detecting a continuing danger—was clearly present here. *See id.* at 510, 98 S.Ct. at 1950 (no warrant needed where officials are detecting "continuing dangers" such as faulty wiring or a defective furnace which may rekindle a blaze). The officials in Lake Village were faced, however, with a more complicated situation than the normal fire scene. A continuing danger was created by the apparent presence of explosive chemicals and destructive devices. Examination of the chemi-

cals present and their potential for further explosion was beyond the expertise of the first local and federal officials who arrived. The danger of another explosion thus remained until the removal of the chemicals under Atlanta ATF agent Byer's direction on February 10.

■ The plurality in *Michigan v. Clifford* also recognized that under *Tyler* there is no bright line test. 464 U.S. at 298 n. 9, 104 S.Ct. at 649 n. 9. The reasonableness of a search will depend on "the circumstances of the particular [hazard] and generally will involve more than the lapse of time or the number of entries and reentries." *Id.* Important considerations are the existence of legitimate privacy interests, exigent circumstances, and whether the object of the search is to determine the cause of the fire or to gather evidence of criminal activity. *Id.* at 292, 104 S.Ct. at 646.

Here, the fact that the explosion occurred in a private residence carries strong expectations of privacy. *Id.* at 295, 104 S.Ct. at 647–48. Yet these expectations must be lowered where a resident admits working with explosive materials in an apartment complex with close neighbors. *See Clifford*, 464 U.S. at 297 n. 8, 104 S.Ct. at 648–49 n. 8 (public safety may prevail over individual privacy expectations when a fire breaks out in an apartment complex and justifies warrantless investigation of future hazard). Further, Boettger's neighbor who broke open the apartment door to rescue him did not testify that he closed the door, and the fire chief said that he found it open.[2] The premises were instead secured by the officials, one of whom stood guard 24 hours outside the apartment. *Compare Clifford*, 464 U.S. at 296–97, 104 S.Ct. at 648–49 (challenged search was not a continuation of earlier one where homeowner took interim efforts to secure burned-out premises, and fire and police units left the scene).

**2.** The fact that Boettger was present at the scene also has some relevance in assessing the privacy interest. Justice Stevens, who was the pivotal vote in *Clifford*, suggested in his concurring opinion that "[a]dvance notice of the search is the best safeguard of the owner's legitimate interests in the privacy of his premises." 464 U.S. at 303, 104 S.Ct. at 652. Here, Boettger was present at the time officials entered his residence. He knew his apartment was to be searched. Although he himself may not have been physically able to remain at the scene, there is no suggestion he could not have contacted a representative to be present to protect his interests. *See also id.* at 310 n. 3, 104 S.Ct. at 655 n. 3 (Rehnquist, J., dissenting).

Most importantly, each official who entered Boettger's apartment did so to ascertain the cause of the explosion and detect other devices which could explode. This situation is unlike *Clifford* where investigators continued to search the whole house even though they had found in the basement the crockpot and timer which had caused the fire. *Id.* at 297–98, 104 S.Ct. at 648–49. The search here on February 10 was for the purpose of seeking the explosion's cause and focused only on destructive devices and chemicals that might form explosive compounds. Most of these were found underneath layers of books, food products, and debris. The devices were removed, catalogued outside the apartment, and then destroyed after samples were taken. Both Byer and Buford testified that no searching was done after the dangerous chemicals and explosive materials were detected and removed. The warrantless search on February 10 thus did not exceed the scope of the exigency. *Compare Mincey v. Arizona*, 437 U.S. 385, 393, 98 S.Ct. 2408, 2413–14, 57 L.Ed.2d 290 (1978) (once the homicide suspect had been apprehended, no emergency justified a four day apartment search that included ripping up carpets).

The district court found the warrantless entry on February 10 justified "as a continuation of the efforts of officials to remove the explosive materials ... since officials had again been hampered by the need to await the arrival of an experienced Explosives Enforcement Officer ... and nightfall." Nevertheless, officials had seen "ample evidence to establish probable cause by the morning of the 9th and had ample time to have obtained a search warrant." The court therefore suppressed all evidence found and seized as a result of the warrantless search on February 10. It did not refer to the large amount of evidence concerning the attempts to locate and secure the appropriate expertise to deal with the situation. It did not mention the continuing danger of the chemicals or attempt to explain why the February 10 entry was justified, but the search was not.

The actions of the officials demonstrate that each acted in the attempt to make the apartment safe. Both Fire Chief Donaldson and Detective Graham searched for the cause of the smoke, and agreed to evacuate the apartment complex after finding the apparent bomb by the door. Detective Graham later showed the coils, liquids, and other potentially explosive devices to the two Little Rock ATF agents to make sure that no accidental explosions occurred. The Arkansas State Police officer left the apartment after a few minutes when he realized the situation was beyond his expertise, as did the two Little Rock agents. The Arkansas officer had been called to determine the cause and nature of the explosion and the ATF agents to assist with handling of the suspected bomb. Finally, Bill Buford, the ATF resident in charge, Atlanta ATF agent Terry Byer, and an Arkansas State Police bomb technician all helped detect and remove the chemical materials from the apartment.

Our court has consistently considered safety factors in determining whether exigent circumstances existed. In *United States v. Antwine*, 873 F.2d 1144, 1147 (8th Cir.1989), we affirmed "our long-held view that legitimate concern for the safety of individuals may constitute 'exigent circumstances' justifying warrantless entries and searches." *See also United States v. Vance*, 53 F.3d 220, 222 (8th Cir.1995) (warrantless entry of home justified on safety grounds).

The Second, Third, and Sixth Circuits agree that the presence of potentially explosive chemicals can present a continuing danger justifying a warrantless search and seizure of a residence. *United States v. Urban*, 710 F.2d 276, 278 (6th Cir.1983) ("the presence of potentially explosive chemicals in the defendant's house are exactly the kind of 'continuing dangers'" the Supreme Court had in mind when it ruled in *Tyler* that officials could remain on the scene for a reasonable time to determine the cause of the hazard); *United States v. Callabrass*, 607 F.2d 559, 564 (2nd Cir.1979), *cert. den.*, 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 794 (1980) (exigency due to need to dispose of dangerous chemicals in order to render the premises safe); and *United States v. Clark*, 617 F.Supp. 693, 697 (E.D.Pa.1985), *aff'd*, 791 F.2d 922 (3rd Cir.1986) (exigency of large quantities of potentially explosive chemicals

was not "extinguished" by the fire department and justified summoning experienced narcotics agents to handle the disassembly). These cases stand for the proposition put forward in *Tyler* and *Clifford* that all the existing circumstances need to be studied to determine whether the warrantless search was justified.

In *Urban*, Detroit firefighters arrived at about 9:00 p.m. to respond to a fire call and were faced with explosions. 710 F.2d at 277. A series of warrantless entries followed, with the last being at 8:00 a.m. the following morning. *Id.* The trial court had suppressed evidence on the basis that a warrant should have been obtained once it was clear that the danger of explosion had ended the previous evening. *Id.* The court of appeals reversed because on its review of the record it did not believe a warrant was necessary for reentry the following morning. *Id.* at 279. The sequence of events was "eminently reasonable" because the firefighters had to notify those with the necessary expertise (the bomb squad and ATF) who arrived subsequently and discovered large quantities of explosives, but decided to wait to remove them the following morning due to lack of lighting and equipment. *Id.* at 279–80.

*Callabrass* was another case in which the first officials on the scene needed experienced help to address an exigency. 607 F.2d at 560–61. Bronx firefighters were followed by detectives who summoned the bomb squad to deal with what appeared to be potentially explosive chemicals. *Id.* at 561–62. The court of appeals upheld the warrantless seizure of evidence which took place about the time the bomb squad removed the chemicals. *Id.* at 564. Just as in *Tyler*, a "prompt investigation was required ... to preserve evidence from intentional or accidental destruction." *Id.* at 563. Many of the materials were volatile, and their disposal was essential for safety. *Id.* at 564.

Similarly, local police and firefighters were untrained to dismantle an apparent drug laboratory or to deal with potentially explosive chemicals in *Clark.* 617 F.Supp. at 695. The narcotics investigator who next arrived concluded that the chemicals presented a highly dangerous situation. *Id.* Two experts from the Drug Enforcement Agency and the Chester County Narcotics Squad were therefore required to dismantle the lab and remove the chemicals. *Id.* The court upheld the warrantless entries and searches because "the chemical dangers present in this case and *Callabrass* constitute exigent circumstances which were at least the equivalent of a danger of rekindling" justifying warrantless entries and searches in *Tyler* and *Clifford.* *Id.* at 697.

■ The situation here is similar to that in these cases upholding warrantless searches. In all, a succession of officials attempted to secure and remove explosive chemicals, and delay resulted from waiting for the proper expert assistance. In the instant case, however, the required expertise was not close at hand. Lake Village did not have knowledgeable chemical explosive experts nearby, unlike Detroit in *Urban* or the Bronx in *Callabrass.* This made necessarily for a longer delay. The explosion here occurred about 120 miles away from the ATF in Little Rock and around 400 miles away from its explosive technology branch in Atlanta where agent Byer worked. Byer's expertise was essential to remove the chemicals, and he did so as soon as there was proper lighting after he arrived. As the *Urban* court pointed out, suspending an investigation overnight because of adverse conditions does not end the exigency. 710 F.2d at 280 (citing *Tyler*, 436 U.S. at 511, 98 S.Ct. at 1950–51).

■ The fireman posted outside Boettger's apartment did not end the possibility of another explosion occurring; only the chemicals' safe removal ended the exigency, as in *Urban, Callabrass,* and *Clark.* There was special public concern in preventing further explosions given the close proximity of neighbors. *See Urban*, 710 F.2d at 277 (adjacent house evacuated due to explosive materials); *United States v. Martin*, 781 F.2d 671, 674 (9th Cir.1985) (explosion in apartment complex increased the community interest in investigating the source for fear of further explosions); *Clifford*, 464 U.S. at 297 n. 8, 104 S.Ct. at 648–49 n. 8 (public safety interests greater during fire in apartment complex). Given the continuing exigent circumstances in this case, the warrantless search

and seizure of the explosive devices and other evidence on February 10 were not unreasonable.

## III.

■ In sum, the entry and search on February 10 were not clearly detached from the initial entries, but rather the continuation of the effort to ascertain the cause of the explosion and detect unknown explosive devices, and were not in violation of the Constitution. *Tyler*, 436 U.S. at 510–11, 98 S.Ct. at 1950–51. The search was conducted as early as possible given the expertise needed and the conditions at the site. This was not a situation like *Clifford* or *Mincey* where officials continued to search for evidence for prosecution after the premises were rendered safe. Here there was a continuing threat to public safety. The seizure of all the destructive devices, the firearm silencer, and bomb-making literature were permissible under the plain-view doctrine. *Clifford*, 464 U.S. at 295 n. 6, 104 S.Ct. at 647 n. 6 (officials "customarily must remove rubble or search other areas where the cause of [the hazard] is likely to be found" and any objects which come into view during this search "may be preserved without a warrant").

For these reasons, the order of the district court suppressing evidence seized during the search of Boettger's apartment is reversed.

BRIGHT, Circuit Judge, dissenting.

The majority emphasizes that "the danger of explosive materials present in Boettger's apartment was an exigent circumstance justifying the search." Op. at 1412. The record and the district court's finding belie that assertion. A determination that exigent circumstances do not exist is a question of fact, and can only be reversed for clear error. *See United States v. Parris*, 17 F.3d 227, 229 (8th Cir.), *cert. denied*, —— U.S. ——, 114

S.Ct. 1662, 128 L.Ed.2d 378 (1994). My review of the record finds ample support for the district court's findings underlying the suppression order.[1] I dissent.

The law in this area seems clear: Exigent circumstances exist only where "lives are threatened, a suspect's escape looms, or evidence is about to be destroyed." *United States v. Johnson*, 12 F.3d 760, 764 (8th Cir.1993) (quotations omitted), *cert. denied*, —— U.S. ——, 114 S.Ct. 2689, 129 L.Ed.2d 821 (1994). The district court correctly interpreted and applied this law by stating:

(1) The court finds that the explosion to which the firemen responded, and the need to investigate the source of the explosion and eliminate any further danger, was a sufficient exigent circumstance to justify the initial warrantless entry by firemen. *Michigan v. Tyler*, 436 U.S. 499 [98 S.Ct. 1942, 56 L.Ed.2d 486] (1978).

(2) The firemen's delegation of their "render safe" operations to police officials and ATF agents was reasonable due to the discovery of explosive materials which the firemen were not trained in handling. Therefore, the warrantless entry by these officials was justified as a continued response to the exigency created by the explosion itself and, once inside, these officers had the right to seize objects of apparent evidentiary value which were in plain view. *Tyler*, at 509–10 [98 S.Ct. at 1949–50].

(3) Since darkness and the need for cautionary handling of the explosives by experienced agents hampered the officials' efforts to remove the explosive materials on the night of February 8th, the court finds that the officials' warrantless entry into plaintiff's apartment on the morning of February 9th was justified as a continua-

---

1. I believe the record also supports the district court's finding that law enforcement officials conducted the February 10th search to obtain evidence of a crime. The Bureau of Alcohol, Tobacco and Firearms (ATF) personnel at Mr. Boettger's home referred to it as a "crime scene," and ATF officer Terry Byer testified that, after removal of the only bomb in plain sight, Byer, "Special Agent Bill Buford, and Rob

Williams and bomb technician John Miller went back in [the apartment] and started going through the debris in the residence and collecting evidence." Tr. at 108.

Additionally, Julie Freese, one of the ATF agents, served as the "evidence technician" (tr. at 108) on February 10th and "recorded each piece of evidence as it was ... brought out ... from the house." Tr. at 76.

tion of the initial investigation of the explosion. *Tyler,* at 511 [98 S.Ct. at 1950–51].

(4) The court finds that the warrantless entry on February 10th was also justified as a continuation of the efforts of officials to remove the explosive materials found during the initial investigation into the cause of the explosion since officials had again been hampered by the need to await the arrival of an experienced Explosive Enforcement Officer (who did not arrive until late in the evening of the 9th) and nightfall.

Dist.Ct.Order at 1–2 (note omitted). The majority, however, contends that the district court's understanding of this law evaporated when it found that there "wasn't any exigent circumstance as of the time [law enforcement officials] went in on the 10th," tr. at 121, to conduct an intensive search of Mr. Boettger's home. I disagree.

By the morning of February 10th, Mr. Boettger's entire apartment complex had been evacuated, and his apartment sealed and placed under armed guard. Terry Byer, an explosives enforcement officer of the Bureau of Alcohol, Tobacco and Firearms, examined Mr. Boettger's apartment on the evening of February 9th, and, leaving an auxiliary fireman behind to guard the apartment, went to spend the night in a motel in another state.[2] He provided the crucial testimony regarding the safety of delaying a search:

> Q. (defense counsel) Mr. Byer, I believe you stated you stepped one step into the doorway and saw the improvised device sitting on the floor?
>
> A. (Mr. Byer) That is correct.
>
> Q. I take it you left it there?
>
> A. Yes.
>
> Q. I take it it wasn't a dangerous device to leave sitting there next to the door?
>
> A. Well, I thought it was safer to leave there—it was secured by an armed guard for the evening—than it was to try to

transport it to the bomb trailer or to a disposal area that night.

> Q. We've got an armed guard just right the other side of the door, though. I mean, he wasn't in any danger?
>
> A. I didn't touch it. I just left it sit.
>
> Q. *Was the guard in any danger by it being left sitting there?*
>
> A. *No, sir. No, sir.* It had a pyrotechnic-type burning with a fuse.
>
> Q. So the fuse had to be ignited before there would be any danger?
>
> A. That or something dropped on it, something of that nature. Could possibly stress the crystals. But it appeared to have been designed to function with a burning-type fuse.
>
> Q. *When you all left that night, there wasn't any danger of anything being lost or destroyed or removed from the apartment, was there?*
>
> A. *Not that I could see or we certainly wouldn't have left.*

Tr. at 109–10 (emphasis added).

The question before the district court was not whether law enforcement officials would have to have special skills or take special precautions to conduct a search, but whether the dictates of public safety authorized a continuing warrantless entry and detailed search of the entire premises. The government's own witness denied that the circumstances of Mr. Boettger's apartment constituted such an immediate danger. In light of this testimony, there are simply no grounds for reversing the district court's finding that sufficient exigent circumstances no longer justified a warrantless search on February 10.

The district court's written order does contain, however, some ambiguous language which I find troubling. The court stated that

> Local, state and federal authorities had seen ample evidence to establish probable cause by the morning of the 9th and had

---

**2.** ATF agents Julie Freese and Bill Buford also examined Mr. Boettger's apartment on the evening of the 9th before departing for hotel accommodations in a neighboring state. Ms. Freese and Mr. Buford believed that the guard left behind was from the Lake Village Police Department, but were unsure if he was a retired auxiliary police officer or if he had any specialized training, and made no attempt to ascertain the guard's credentials. *See* Tr. at 81 (testimony of Ms. Freese), 98 (testimony of Mr. Buford).

ample time to have obtained a search warrant. The police guard posted at the apartment had minimized the possibility that any evidence of criminal activity would be lost, destroyed, or removed during the time required to obtain a search warrant. Therefore, any evidence found and seized as a result of the warrantless search on the 10th will be suppressed.

Dist.Ct.Order at 3. That law enforcement officials had time to seek a warrant and failed to do so, however, "is not fatal to [a] finding that exigent circumstances justified [a warrantless] entry." *United States v. Palumbo*, 735 F.2d 1095, 1097 (8th Cir.), *cert. denied*, 469 U.S. 934, 105 S.Ct. 332, 83 L.Ed.2d 268 (1984). As it is unclear whether the district court based its suppression order on the lack of exigent circumstances or on law enforcement officials' failure to seek a warrant, I would remand this case to the district court for a clarification of its findings.