# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-2006

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff-Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Western District of Missouri. |
| Robert K. Francis, Jr., | * | |
| | * | |
| Defendant-Appellant. | * | |

_____

Submitted: November 5, 2002

Filed: April 28, 2003

_____

Before McMILLIAN and SMITH, Circuit Judges, and LONGSTAFF,[1] District Judge.

_____

SMITH, Circuit Judge.

Robert K. Francis, Jr. challenges the sufficiency of all and the admissibility of some of the evidence used to convict him. At trial, a jury convicted Francis, Jr. of attempting to manufacture ten grams or more of methamphetamine, possession of marijuana with intent to distribute, and possession of equipment used for drug

_____

[1] The Honorable Ronald E. Longstaff, Chief Judge, United States District Court for the Southern District of Iowa, sitting by designation.

manufacturing.[2] The District Court[3] sentenced Francis, Jr. to sixty-three months' imprisonment, followed by a four-year term of supervised release. We affirm.

## I.

### *Background*

On March 22, 1997, the Independence, Missouri, police and fire departments responded to a residential fire. While extinguishing the fire, firefighters discovered items they recognized as potential implements of a once operational methamphetamine laboratory. The firefighters saw these items in plain view during their examination of the basement.[4] Due to the suspicious nature of the fire and the items found in the basement, Independence Fire Department (IFD) Investigator Kelly Scott inspected the site. Upon entering the house, Scott immediately went to the basement. While there, Scott saw a cardboard box containing glass beakers and other items commonly found in drug laboratories. Several glass containers had fallen out of the box. Based upon his investigation, Scott surmised that the fire probably originated in the basement when the water heater's open flames ignited fumes emanating from a broken glass container. Because of the nature of the items found in the basement and the continuing danger of poisonous vapors, Scott ordered all IFD personnel from the structure and called for the Special Operations Unit to respond to the scene.

---

[2] Francis was charged under 21 U.S.C. §§ 841(a)(1), (b)(1)(B), 843, and 846.

[3] The Honorable Howard F. Sachs, United States District Court for the Western District of Missouri.

[4] These items included various laboratory glass containers filled with separating liquids, a red Coleman cooler with multiple bags of packaged marijuana, a triple-neck round-bottom flask, an acid bottle, various containers of solvents commonly used in the manufacture of methamphetamine, and other miscellaneous items.

Independence Police Department (IPD) Sergeant Cox and Officer Anderson entered the residence after speaking with Scott and learning of the apparent drug-related items in the basement. After confirming that no one was in the house, the officers went directly to the basement with the firemen. Cox and Anderson observed the glassware and the burned box. They also saw an open Coleman cooler that contained marijuana. Prior to entering the residence, neither Cox nor Anderson spoke with Francis, Jr. or his father. Cox testified that after viewing the house, he considered it a crime scene and posted Anderson at the front door. Cox then discussed his observations with IPD Detectives Sweeney and Slaybaugh. The IPD did not evacuate or close off the surrounding neighborhoods and did not evacuate any neighboring homes.

Following Cox's and Anderson's viewing of the house, IPD Detectives Sweeney and Slaybaugh and Jackson County Drug Task Force Detective Cook entered the house and went to the basement.[5] The detectives saw in plain view components of a possible methamphetamine lab in a burned area in the southwest part of the basement. It appeared to be the same area where the fire began. Based on their training and experience, Slaybaugh and Sweeney agreed that an operational methamphetamine lab was located in the basement.

Sweeney and Slaybaugh then spoke with both Robert K. Francis, Sr.–the owner of the home–and Francis, Jr. about the discovery. The detectives described the items they had discovered and asked for consent to search the rest of the home. The officers advised the Francises that if they refused to give consent, the police would seek a search warrant. Francis, Jr. directed the investigators to ask his father, and when they did, Francis, Sr., signed the consent-to-search form. With the signed consent,

---

[5] Detectives Sweeney and Slaybaugh worked with IPD's Special Operations/Drug Enforcement Unit. Detective Cook was detailed to the Drug Enforcement Agency.

Slaybaugh and Sweeney reentered the house to assess the situation.[6] At that time, the multiple flammable liquids and other chemicals associated with the methamphetamine lab had not been removed.

During the clean-up, the DEA and IPD recovered numerous drug-related items from the home including a book entitled "Third Edition of Uncle Fester's Methamphetamine Manufacturing."[7] Laboratory analysis indicated that the materials recovered from the home could potentially produce ten grams or more of methamphetamine. Additionally, the team recovered over two pounds of marijuana. Based on the discovery of these materials, the police arrested and charged Francis, Jr.

At trial, Francis Jr. and his father testified that the methamphetamine laboratory equipment, chemicals, and supplies did not belong to Francis, Jr. They contended that he unknowingly acquired them when he purchased a vehicle from a coworker.

---

[6] The detectives contacted the Drug Enforcement Administration (DEA) to assist in processing and decontaminating the scene. IPD called the DEA because, at that time, IPD had neither the experience nor the safety equipment to properly assess and clean up a methamphetamine lab.

[7] Other items recovered in the clean-up included coffee filters stained with red phosphorous, juice jars with coffee filters, a 1,000 ml Pyrex flask, a bottle of hydrochloric acid, another 1,000 ml flask half full with a liquid, a bottle of Vitablend, a triple-neck Pyrex beaker containing actively-reacting liquids, a large plastic baggie that contained coffee filters with red stains, miscellaneous tubing and hoses, a bottle of PH paper, empty Mason jars, muriatic acid, laboratory funnels, multiple 500 ml Pyrex flasks, miscellaneous funnels, Pyrex measuring material, acetone, and other chemical containers. In plain view in the upstairs living area, the officers found sixty-seven tablets containing pseudoephedrine and the manual of how to make methamphetamine. Officers also discovered marijuana, marijuana seeds, and marijuana paraphernalia in the living room. In addition, officers found a Norinco .45 caliber handgun, a Winchester shotgun, a .22 rifle, and a 30.30 rifle in bedrooms upstairs.

According to the Francises's account, Dennis Lucas, Francis, Jr.'s work supervisor, owed Francis, Jr. approximately $600. As payment, Lucas gave Francis, Jr. a pickup truck. Trash bags and boxes filled the truck bed when the Francises took the truck from Lucas's driveway. Rather than unload the bags and boxes at that time, Francis, Jr. drove home and unloaded the items into the garage, where they remained for four to five months. Francis, Jr. later took them to the basement to clear the garage. He testified that the cardboard box ended up on the clothes dryer after he had emptied chemicals out of it (and other boxes) into a water bottle in the basement. He testified that although he saw the various glass containers, he did not know what they were. He found the methamphetamine book in one of the boxes he was emptying and took it upstairs to read. He testified, however, that he did not see anything in the book that looked like any of the items he found in the truck, although he did suspect at that time that it may have had something to do with those items. Francis, Jr. testified that after he was charged in this case, he learned that Lucas had been charged with manufacturing and distributing methamphetamine. During his testimony, Francis, Jr. was shown a judgment and docket sheet that indicated that Lucas actually had first appeared in court on March 14, 1997, seven days prior to the fire at the Francises' house.

Francis, Jr. admitted ownership of the marijuana found in the house and pleaded guilty of possession. He testified that he found the Coleman cooler near the railroad tracks next to a field of marijuana, and he picked the marijuana and threw it in the cooler. He testified that he later separately bagged some of the usable portions and had been using portions from one of the bags. He testified, however, that he never intended to sell the marijuana. Francis, Jr., a disabled veteran, identified a list of medications, including pseudoephedrine hydrochloride 60 mg tablets, prescribed by the Veterans Administration Hospital. He testified that he purchased the pills found in his house at the hospital in Independence and was taking them by prescription.

Following his indictment, Francis, Jr. filed a motion to suppress. He argued that exigent circumstances did not exist to justify the warrantless search of the premises, and the items found in the search should be suppressed. The magistrate recommended denying the motion, and the District Court accepted the denial in relevant part.

## II.

### *Sufficiency of the Evidence*

In his first argument, Francis, Jr. challenges the sufficiency of the evidence on the charge of attempted manufacture of methamphetamine. For his challenge to succeed, Francis must pass a strict standard. He must show that based upon the evidence adduced at trial, no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Gillings*, 156 F.3d 857, 860 (8th Cir. 1998) (internal citations omitted). In determining whether an appellant meets this standard, we review the evidence in the light most favorable to the government, resolving evidentiary conflicts in the government's favor. *Id*. Circumstantial evidence as well as direct evidence may support a conviction. *Id*. We will not lightly overturn the verdict of a jury. *Id*.

Francis, Jr., in large measure, bases his sufficiency argument on alleged inconsistencies in the testimony. He points out that only one of the government's witnesses, Detective Cook, opined that an active methamphetamine "cook" was in progress. Francis, Jr. notes that IFD Inspector Scott testified that the items stacked in the cardboard box did not appear to be part of an operating methamphetamine lab. The other government witnesses testified that while one had occurred at some time, it was not in progress at the time of the fire. Furthermore, Francis, Jr. argues that the evidence failed to account for the amount of ephedrine binder residue indicated by test results. He contends that the number of pills missing from his supply would not produce the quantity discovered. Francis, Jr. also argues that the government should have checked unidentified fingerprints found on some bottles for a match with Lucas, the individual from whom he had purchased the truck containing the incriminating

evidence. The government responds that the evidence shows that Francis, Jr. took a substantial step in commission of the charged offense. The lab in his home contained extracted pseudoephedrine and binding material indicating that the first step of the process–extraction of the ephedrine–had been completed. Uncontradicted expert testimony indicated that the fire started at the site of the lab equipment when fumes from a combustible liquid made contact with flame.

The evidence supports the finding that a methamphetamine lab existed in the basement of the Francises' home and that Francis, Jr. knew of the presence of the lab equipment. Francis, Jr. admitted possessing and reading a book about how to make methamphetamine at the time that the lab, at least by one expert's account, was engaged in an active methamphetamine "cook." Although, the government produced no eyewitness testimony of Francis, Jr. in the basement holding a bubbling beaker, it was not required to do so. Rather, a conviction may be based on circumstantial evidence, such as that in this case, and we will accept all reasonable inferences drawn from the evidence that support the jury's verdict. The evidence need not exclude every reasonable hypothesis except guilt. "If the evidence rationally supports two conflicting hypotheses, the reviewing court will not disturb the conviction." *Gillings,* 156 F.3d at 860. Consequently, while Francis, Jr. offered an alternative explanation for the presence of the lab items in his basement, the jury need not have accepted it. As we have often noted, the jury is always the ultimate arbiter of a witness's credibility, and this Court will not disturb the jury's findings in this regard. *United States v. Cunningham*, 83 F.3d 218, 222 (8th Cir.1996); *United States v. Witschner*, 624 F.2d 840, 843 (8th Cir. 1980). A rational trier fact could have found the elements of manufacture of methamphetamine based upon the evidence adduced in this case. We, therefore, reject Francis, Jr.'s sufficiency argument.

III.

*Suppression Motion*

Francis, Jr. next argues that the District Court erred in denying his motion to

suppress. Francis, Jr. contends that the police and firefighters violated the Fourth Amendment by conducting searches without the justification of a warrant, consent, or exigent circumstances. In reply, the government maintains that exigent circumstances existed because the search occurred on dangerous, fire-damaged property in which volatile chemicals used to manufacture methamphetamine started a fire. The government argues that the exigency did not end with the "dousing of the last flame." Additionally, the government argues that the police officers reasonably relied on the Francises' valid consent that cured any search impropriety.

In reviewing a denial of a motion to suppress, we review the district court's factual findings for clear error and review de novo the question of law regarding the warrantless search. *Ornelas v. United States*, 517 U.S. 690, 699 (1996); *United States v. Sanders,* 196 F.3d 910, 912 (8th Cir.1999).

The government's obligation to obtain a warrant prior to a search is an important means for enforcing the Fourth Amendment's proscription against unreasonable searches and seizures. "... [O]ne governing principle, justified by history and by current experience, has consistently been followed: except in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant." *United States v. Boettger*, 71 F.3d 1410, 1414 (8th Cir. 1995) (quoting *Camara v. Municipal Court,* 387 U.S. 523, 528-29 (1967)). However, not every search without a warrant is unreasonable if an exception, such as the presence of exigent circumstances, exists.

Although the exigent-circumstances exception is narrowly drawn, *United States v. Ball*, 90 F.3d 260, 263 (8th Cir. 1996), it does justify immediate police action without a warrant under limited circumstances, such as where lives are threatened, a suspect's escape is imminent, or evidence is about to be destroyed. *Michigan v. Tyler,* 436 U.S. 499, 509 (1978); *Warden, Maryland Penitentiary v. Hayden,* 387 U.S. 294, 298-99 (1967); *Ker v. California,* 374 U.S. 23, 42 (1963).

The Supreme Court considered the exigent-circumstances exception to the warrant requirement in relation to entries onto fire-damaged property in *Tyler* and *Michigan v. Clifford,* 464 U.S. 287 (1984). Although the cases do not provide a bright-line rule to distinguish between finding the fire's source and looking for evidence of arson, *Clifford* at 298 n. 9, these cases provide important guidance in determining when a dangerous situation may justify a reasonable warrantless entry or search. In *Tyler,* for example, the Court held that no warrant is needed where officials are investigating "for a reasonable time" the cause of a fire after it has been extinguished. 436 U.S. at 510. The Court recognized that circumstances of the individual situation "will vary widely," and that "in determining what constitutes a 'reasonable time to investigate,' appropriate recognition must be given to the exigencies that confront officials serving under these conditions, as well as to individuals' reasonable expectations of privacy." *Id.* at n. 6. Furthermore, in *Clifford*, the Court indicated that the reasonableness of a search will depend on "the circumstances of the particular [hazard] and generally will involve more than the lapse of time or the number of entries and reentries." *Id.* Other important considerations include the existence of legitimate privacy interests, whether exigent circumstances justify the intrusion, and whether the object of the search is to determine the cause of the fire or to gather evidence of criminal activity. *Clifford,* 464 U.S. at 292.

We have also considered safety factors in determining whether exigent circumstances exist. *See Boettger,* 71 F.3d at 1415; *United States v. Antwine,* 873 F.2d 1144, 1147 (8th Cir.1989); *United States v. Vance,* 53 F.3d 220, 222 (8th Cir.1995). In *Boettger*, the authorities faced an exceptional fire scene when the defendant's attempts at bomb-making went awry, causing an explosion in his apartment. The presence of potentially explosive chemicals created safety concerns for the investigators and apartment neighbors, thus justifying the warrantless search

of the apartment.[8] As noted in *Antwine*, we affirmed "our long-held view that legitimate concern for the safety of individuals may constitute 'exigent circumstances' justifying warrantless entries and searches." 873 F.2d at 1147.

We also note this court's application of *Boettger's* safety exception in the context of the discovery of a suspected methamphetamine lab. In *United States v. Walsh*, 299 F.3d 729 (8th Cir. 2002), the officers smelled the presence of ether, a substance used in the manufacture of methamphetamine, and saw various pieces of equipment associated with methamphetamine production outside of a shed. The officers conducted a brief warrantless search of the shed to look for an operating methamphetamine lab and anyone who might be hiding. We agreed that the officers' stated concern about safety justified their limited search. Specifically, *Walsh* includes the following observation:

> The potential hazards of methamphetamine manufacture are well documented, and numerous cases have upheld limited warrantless searches by police officers who had probable cause to believe they had uncovered an on-going methamphetamine manufacturing operation. *See United States v. Wilson,* 865 F.2d 215, 217 (9th Cir.1989); *United States*

---

[8] In *Boettger*, we noted that the Second, Third, and Sixth Circuits agree that the presence of potentially explosive chemicals can present a continuing danger justifying a warrantless search of a residence. 71 F.3d at 1415-16 (citing *United States v. Urban,* 710 F.2d 276, 278 (6th Cir.1983) ("the presence of potentially explosive chemicals in the defendant's house are exactly the kind of 'continuing dangers' " the Supreme Court had in mind when it ruled in *Tyler* that officials could remain on the scene for a reasonable time to determine the cause of the hazard); *United States v. Callabrass,* 607 F.2d 559, 564 (2d Cir.1979), *cert. den.,* 446 U.S. 940 (1980) (exigency due to need to dispose of dangerous chemicals in order to render the premises safe); and *United States v. Clark,* 617 F.Supp. 693, 697 (E.D.Pa.1985), *aff'd,* 791 F.2d 922 (3rd Cir.1986) (exigency of large quantities of potentially explosive chemicals was not "extinguished" by the fire department and justified summoning experienced narcotics agents to handle the disassembly).

*v. Echegoyen,* 799 F.2d 1271, 1278-79 (9th Cir.1986); *United States v. Brock,* 667 F.2d 1311, 1318 (9th Cir.1982), *cert. denied,* 460 U.S. 1022, 103 S.Ct. 1271, 75 L.Ed.2d 493 (1983); *United States v. Williams,* 630 F.2d 1322, 1326-27 (9th Cir.), *cert. denied sub nom. Murchison v. United States,* 449 U.S. 865, 101 S.Ct. 197, 66 L.Ed.2d 83 (1980) (PCP lab); *United States v. Erb,* 596 F.2d 412, 418 (10th Cir.), *cert. denied,* 444 U.S. 848, 100 S.Ct. 97, 62 L.Ed.2d 63 (1979). *See also United States v. Dick,* 173 F.Supp.2d 765, 771 (E.D.Tenn.2001) (methamphetamine lab in apartment complex warranted sentence enhancement under U.S.S.G. § 2D1.1(b)(6) because it "created a substantial risk of harm to human life"). Here, the strong smell of ether and the equipment and residue found in the carport area suggested on-going manufacture in the shed. Officer Cantrell could not be certain no one was hiding (or worse yet, lying unconscious) in the shed, and Officer McPhail was justified in verifying that no untended heat source was creating an imminent risk of fire or the explosion of volatile chemicals.

299 F.3d at 734. *See also United States v. Clayton*, 210 F.3d 841 (8th Cir. 2000).

In this case, although the District Court stated its reservations regarding the searches conducted by police officers prior to gaining consent, the court determined that several factors weighed in favor of validating the warrantless searches due to exigent circumstances.[9] The District Court, however, specifically excluded evidence

---

[9] The District Court listed five factors justifying the warrantless searches, including: 1) the arson investigator properly came upon the evidence that was in plain sight; 2) the arson investigator contacted police officers for safety reasons; 3) Detective Sweeney testified that he entered the residence out of concerns for public safety; 4) Detective Sweeney testified that he was convinced the matters he saw in the basement of the residence constituted a methamphetamine laboratory; 5) the police

regarding jars of frozen liquid found in the upstairs refrigerator because the court determined that the search of the refrigerator was unwarranted. The District Court stated, "There is no showing or claim that a methamphetamine-caused fire or an explosion could result spontaneously from items in a refrigerator." In light of the applicable case law, we affirm the District Court's determination that exigent circumstances existed and justified the initial warrantless searches of the Francis residence. Furthermore, because we agree with the District Court that the authorities conducted the warrantless searches based on exigent circumstances, we need not address whether the Francises' subsequently-obtained consent operated to validate the searches.

## IV.

### *Admission of Evidence*

Finally, Francis, Jr. argues that the improper admission of gun evidence entitles him to a new trial. The prosecution introduced this evidence to show that firearms are often present when methamphetamine manufacturing is involved. The District Court admitted the evidence, but instructed the jury that "the firearms are not to be used as proof of the drug charges that are before the jury." Francis, Jr. now contends that this curative instruction was inadequate. However, Francis, Jr. did not object to the curative instruction, seek a mistrial, or file a motion for new trial. This failure renders our review as one for plain error.

We review for plain error issues about which trial counsel failed to object or otherwise raise before the district court. *United States v. Yellow Hawk*, 276 F.3d 953, 955 (8th Cir. 2002). Under Federal Rule of Criminal Procedure 52(b), we may notice an error not raised below if (1) there is an error, (2) that is "plain," and (3) that "affect[s] substantial rights." *United States v. Olano,* 507 U.S. 725, 732 (1993). In

---

officers knew that chemicals associated with methamphetamine laboratory are subject to burning and explosions.

addition, even if the forfeited error meets the above criteria, we will exercise our discretion to order correction only if the error "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *United States v. Green,* 151 F.3d 1111, 1114 (8th Cir. 1998)*; Olano*, 507 U.S. at 732. The District Court gave appropriate instructions to the jury about the firearms, and we assume the jury followed this instruction. *United States v. Karam,* 37 F.3d 1280, 1288 (8th Cir.1994)

Under the present facts and applicable precedents, the trial court's admission of the testimony was not error, plain or otherwise. The jury convicted Francis, Jr. of three narcotics offenses, including attempted manufacture of methamphetamine, possession with intent to distribute marijuana, and possession of drug paraphernalia. Francis, Jr. attempts to distinguish the cases in which courts have upheld admission of firearms as evidence of use in the drug trade. He argues that the government charged him with attempted manufacture of methamphetamine only rather than with a distribution charge. However, he ignores that the jury convicted him of possession with intent to deliver marijuana, and that this clearly involves elements of the drug trade. In *United States v. Regans,* 125 F.3d 685, 686 (8th Cir.1997), we observed that a firearm is a "tool of the trade" for drug dealers, and that a connection can be inferred where there is a firearm and distribution quantity. *See also United States v. Schubel,* 912 F.2d 952, 956 (8th Cir.1990).

Even if we considered only the attempted manufacture charge, Francis, Jr.'s argument still fails. This court rejected this same argument in *United States v. Maza,* 93 F.3d 1390 (8th Cir. 1996). In *Maza*, one of the defendants argued that he was denied a fair trial because the guns seized by the police when he was arrested were admitted as evidence even though there was no proof of any connection to the charged crime of conspiracy to distribute methamphetamine. In a plain-error review, we acknowledged that firearms are generally considered tools of the drug trade, and as such, the presence of firearms in that defendant's vehicle was relevant to his participation in the conspiracy to distribute methamphetamine and did not prejudice

his right to a fair trial. Such is the instant case. We affirm the District Court.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-14-