UNITED STATES of America,

v.

**William DICK, Bryan Ritchie, and Krystal Tate Layne.**

No. 1:01–CR–42–3.

United States District Court,
E.D. Tennessee,
at Chattanooga.

Nov. 13, 2001.

---

Rita C. LaLumia, Federal Defender Services of Eastern Tennessee, Inc., Chattanooga, TN, M. Keith Davis, Dunlap, TN, for William Dick.

Clayton M. Whitaker, Foster, Foster, Allen & Durrence, Chattanooga, TN, for Bryan Ritchie.

R. Dee Hobbs, Bell, Turner & Hobbs, Chattanooga, TN, for Krystal T. Layne.

Paul W. Laymon, U.S. Dept. of Justice, Chattanooga, TN, for U.S.

## MEMORANDUM AND ORDER

COLLIER, District Judge.

Defendants William Dick ("Dick"), Bryan Ritchie ("Ritchie"), and Krystal Tate Layne ("Layne") appeared before the Court for a sentencing hearing on October 5, 2001. In advance of the hearing, the United States Probation Office ("Probation") prepared presentence reports ("PSR") on each Defendant.[1] Probation recommended the Court apply a sentencing enhancement recognizing the substantial risk of harm associated with the manufacture of methamphetamine. *U.S. Sentencing Guidelines Manual*

---

1. "The probation officer must make a presentence investigation and submit a report to the court before the sentence is imposed...." Fed.R.Crim.P. 32(b). The PSRs were disclosed to Defendants and to counsel for Defendants and the government at least thirty-five days prior to the sentencing hearing. *See* E.D.TN.L.R. 83.9.

§ 2D1.1(b)(6)(A) (Supp.2000). Defendants objected to the recommended application. At the sentencing hearing, the Court heard testimony and considered the arguments of counsel. Because the application of this relatively new sentencing enhancement is a matter of first impression, the Court has decided to put its analysis in writing. For the reasons outlined below, the Court **DENIED** Defendants' objections and **APPLIED** the enhancement.

## I. RELEVANT FACTS

On February 21, 2001, based on evidence of an operational methamphetamine laboratory gathered by a confidential informant, law enforcement officers obtained a search warrant for an apartment rented to Dick. The apartment is located in Chattanooga, Tennessee in a large apartment complex containing several dozen buildings. The buildings are situated in close proximity to one another. (A map of the complex is attached to this Order.) This area of Chattanooga, Tennessee contains several large apartment complexes all in close proximity to each other and to a creek running into the nearby Tennessee River.

Later that day, officers executed the warrant. They discovered Ritchie and Layne in the apartment. Dick arrived a short time later. According to the factual bases supporting their respective written plea agreements,[2] Ritchie had ephedrine hidden in his pants, and Layne had methamphetamine hidden in her mouth. At the sentencing hearing, a law enforcement officer testified that Defendants used the ephedrine reduction method of metham-

phetamine manufacture. The officer testified about the various items commonly used in this method that were found throughout the apartment. These items included an empty gallon container of acetone and an empty gallon container of campstove fuel. Acetone is a highly flammable substance. It is difficult to control or extinguish when on fire. Campstove fuel is both flammable and explosive. Other testimony indicated the residents in the apartment below Dick's apartment had frequently complained to the apartment superintendent about a lingering odor of nail polish. Acetone smells like nail polish.

Ritchie and Layne each admitted in their plea agreements they had manufactured methamphetamine in Dick's apartment on more than one occasion. Layne's factual basis states, "Dick provided the location and shared in the finished product, while Ritchie and Layne acquired the chemicals." The PSRs indicate Defendants regularly used methamphetamine until they were arrested.

Defendants each pleaded guilty to one count of attempt to manufacture methamphetamine, 21 U.S.C. §§ 846, 841(b)(1)(C). In the PSRs submitted to the Court,[3] Probation attributed 19.4 grams of methamphetamine mixture to Dick, 22.4 of methamphetamine mixture to Ritchie, and 19.4 grams of methamphetamine mixture to Layne. Based on these quantities, Probation calculated Dick's initial base offense level to be 18, Ritchie's 20, and Layne's 18. *U.S. Sentencing Guidelines Manual* § 2D1.1(a)(3). Probation added two levels to Ritchie's offense level because he pos-

---

**2.** "Notwithstanding the acceptance of a plea of guilty, the court should not enter a judgment upon such plea without making such inquiry as shall satisfy it that there is a factual basis for the plea." Fed.R.Crim. p. 11(f). The factual basis for Dick's guilty plea was

submitted separately because he did not enter into a plea agreement with the government.

**3.** Defendants did not dispute the accuracy of the facts set forth in the PSRs or contained in the testimony of the law enforcement officer who testified at the sentencing hearing.

sessed a semi-automatic pistol. *Id.* § 2D1.1(b)(1). Probation then increased each Defendant's offense level to 27 because the offense involved the operation of a methamphetamine laboratory that created a substantial risk of harm of human life. *Id.* § 2D1.1(b)(6)(A). Probation calculated Dick's criminal history category to be IV, Ritchie's I, and Layne's IV. Based on an offense level of 27 and a criminal history category of IV, Probation calculated the guideline range for Dick and Layne to be 77–96 months. Based on an offense level of 27 and a criminal history category of I, Probation calculated the guideline range for Ritchie to be 51–63 months. The statutory maximum for a violation of 21 U.S.C. § 841(b)(1)(C) is twenty years. The Court sentenced Dick and Layne to 87 months and Ritchie to 51 months.

## II. DISCUSSION

Defendants object on factual and constitutional grounds to the application of section 2D1.1(b)(6) to their sentences. Defendants first contend the provision is not mandatory, arguing the Court should exercise its discretion not to apply the enhancement given the facts of the case. Defendants next contend the provision violates their constitutional right to due process, arguing its application potentially results in disproportionate sentence enhancements. After considering the purpose of the enhancement, the legality of analogous enhancements, and the particular circumstances of Defendants' offense, the Court finds Defendants' arguments unpersuasive.

### A. Factual Challenge

On October 17, 2000, the United States Congress passed the Methamphetamine Anti–Proliferation Act of 2000. Section 102 of the Act instructs the United States Sentencing Commission to amend the fed-

eral sentencing guidelines to provide for enhanced punishment of certain methamphetamine laboratory operators:

(1) IN GENERAL.—Pursuant to its authority under section 994(p) of title 28, United States Code, the United States Sentencing Commission shall amend the Federal sentencing guidelines in accordance with paragraph (2) with respect to any offense relating to the manufacture, attempt to manufacture, or conspiracy to manufacture amphetamine or methamphetamine in violation of—

(A) the Controlled Substances Act (21 U.S.C. 801 et seq.);

．　　．　　．　　．　　．

(2) REQUIREMENTS.—In carrying out this paragraph, the United States Sentencing Commission shall—

(A) if the offense created a substantial risk of harm to human life (other than a life described in subparagraph (B)) or the environment, increase the base offense level for the offense—

(i) by not less than 3 offense levels above the applicable level in effect on the date of the enactment of this Act; or

(ii) if the resulting base level after an increase under clause (i) would be less than 27, to not less than level 27;

(B) if the offense created a substantial risk of harm to the life of a minor or incompetent, increase the base offense level for the offense—

(i) by not less than 6 offense levels above the applicable level in effect on the date of the enactment of this Act; or

(ii) if the resulting base level after an increase under clause (i) would

be less than 30, to not less than level 30.

.    .    .    .    .

Methamphetamine Anti–Proliferation Act of 2000, Pub.L. No. 106–310, § 3612, 14 Stat. 1228–29 (2000). On December 16, 2000, the United States Sentencing Commission amended section 2D1.1(b) of the federal sentencing guidelines:

> If the offense (i) involved the manufacture of amphetamine or methamphetamine; and (ii) created a substantial risk of harm to (I) human life other than a life described in subsection (b)(6)(B); or (II) the environment, increase by 3 levels. If the resulting offense level is less than 27, increase to level 27.

*U.S. Sentencing Guidelines Manual* § 2D1.1(b)(6)(A) (Supp.2000).[4]

■ The legislative history behind § 2D1.1(b)(6) indicates Congress intended federal courts to enhance the sentence of *any* operator of a methamphetamine laboratory that created a substantial risk of harm to human life or the environment. The Committee on the Judiciary explained the dangers inherent to such laboratories necessitated the enhancement provision:

> The committee notes the grave danger amphetamine and methamphetamine manufacturing poses to human life and the environment. Law enforcement officials cite frequent discovery of children living and playing among toxic and volatile chemicals in home-based amphetamine and methamphetamine laboratories. Federal, State and local law enforcement spend significant amounts of tax-payer dollars cleaning up toxic waste left behind by amphetamine and methamphetamine laboratories. Increasing the offense levels is necessary given the threat and harm inflicted on communities by amphetamine and methamphetamine manufacturers.

H.R.Rep. No. 106–878, pt. 1, at 27 (2000). In response to such inherent dangers, Congress included in the Methamphetamine Anti–Proliferation Act instructions that the Sentencing Commission "shall" increase the base offense level for methamphetamine manufacturing offenses creating a substantial risk of harm to human life or the environment. In complying with Congress's directive, the Sentencing Commission created a minimum offense level—a "floor"—for those defendants who create such a risk.

It is not at all unusual for the Sentencing Commission to establish such minimum offense levels. The sentencing guidelines create numerous such floors based on various offense characteristics, many of which relate to the creation of some intangible or unquantifiable harm. *See, e.g., U.S. Sentencing Guidelines Manual* §§ 2B1.1(b), 2B4.1(b), 2B5.1(b), 2B5.3(b), 2B6.1(b), 2D1.1(b)(6), 2F1.1(b), 2K1.3(b), 2K2.1(b), 2L1.1(b), 2P1.2(b), 2T1.1(b). Section 2F1.1(b)(5)(C), for example, creates a minimum offense level of 12 for acts of fraud in which a defendant uses a victim's personal information (*e.g.*, a social security number) to procure additional means of identification (*e.g.*, a credit card) in the victim's name. The sentencing guidelines establish a floor for such fraudulent acts because they often result in considerable yet unquantifiable hardships, harms which otherwise might not be taken into account in sentencing. *See United States v. Karro,* 257 F.3d 112 (2d Cir.2001) (noting U.S.S.G. § 2F1.1(b)(5)(C) "provides a minimum offense level of level 12, in part, because of the seriousness of the offense" and "accounts for the non-monetary harm associated with these types of offenses, much of which may be difficult or impossible to

---

**4.** Subsection (b)(6)(B) concerns "harm to the life of a minor or an incompetent."

quantify"); *United States v. Humber*, 255 F.3d 1308 (11th Cir.2001) (noting U.S.S.G. § 2F1.1(b)(5)(C) "add[s] a 'floor' to a defendant's base offense level").

■ Considering the analogous provisions of the sentencing guidelines and the imperative language used by Congress and the Sentencing Commission, and because "[s]entencing guidelines should be read as they are written," the Court construes section 2D1.1(b)(6) to be a mandatory provision designed to punish the unquantifiable harms often associated with the operation of a methamphetamine laboratory. *See United States v. Cobb*, 250 F.3d 346 (6th Cir.2001) (citation omitted) ("providing that minimum offense levels should be strictly applied when a defendant's conduct precisely fits the plain language of the enhancement provision").

The real question faced by the Court in this case is whether the methamphetamine laboratory operated by Defendants created a substantial risk of harm to human life or the environment. The application note to section 2D1.1(b)(6) provides some guidance, offering a nonexclusive list of factors a court "may consider" in answering the question:

(A) *Factors to Consider.*—In determining, for purposes of subsection (b)(6), whether the offense created a substantial risk of harm to human life or the environment, the court may consider factors such as the following:

(i) The quantity of any chemicals or hazardous or toxic substances found at the laboratory, or the manner in which the chemicals or substances were stored.

(ii) The manner in which hazardous or toxic substances were disposed, or the likelihood of release into the environment of hazardous or toxic substances.

(iii) The duration of the offense, or the extent of the manufacturing operation.

(iv) The location of the amphetamine or methamphetamine laboratory (*e.g.,* in a residential neighborhood or a remote area) and the number of human lives placed at substantial risk of harm.

*U.S. Sentencing Guidelines Manual* § 2D1.1, Application Note 21. These factors, which correspond to Congress's specific concerns, address both the type and magnitude of dangers posed by methamphetamine laboratories.

The factual bases supporting Ritchie's and Layne's plea agreements and evidence presented at the sentencing hearing indicate Defendants operated their methamphetamine laboratory in an apartment located in an eight-unit building. All the apartments in the building were occupied at the time. The building was one of a number of buildings in a large, densely constructed apartment complex. The complex was therefore heavily populated.

Defendants admitted to operating a methamphetamine laboratory in the apartment. The method of manufacture they used required various chemical to be subjected to heat (*i.e.,* by "cooking"). This cooking requires a source of heat. Through chemical reactions and separation methods, methamphetamine is produced and recovered. Various toxic and hazardous substances were recovered from the apartment. These included empty gallon containers of campstove fuel and acetone. These chemicals posed the risk of fire and explosion. Moreover, because Defendants admitted to cooking methamphetamine, it is reasonable to assume they produced phosphate gas, which is a byproduct of methamphetamine manufacture. This gas is highly flammable and explosive.

Under normal circumstances, in which individuals in full control of their faculties conduct chemical reactions in residential areas, a serious risk of harm is present. Because Defendants are admitted methamphetamine users and their PSRs suggest they were frequently under the influence of methamphetamine, it is reasonable to assume they were under the influence of methamphetamine while operating the laboratory. Cooking methamphetamine while under the influence of methamphetamine obviously heightens the already serious risks inherent to methamphetamine manufacture. In addition to the danger of fire and explosion, the chemicals present in the apartment posed an inhalation risk. Indeed, the residents of the apartment below the laboratory complained of the smell of nail polish for some time prior to the raid resulting in Defendants' arrest.[5]

■ In short, Defendants' particular laboratory was inherently dangerous. Accordingly, based on the location of Defendants' methamphetamine laboratory in a crowded apartment complex, the methamphetamine method used, the dangerous chemicals found in the laboratory, the risk of explosion, and the number of persons who lived near to the laboratory, the Court finds by clear and convincing evidence Defendants' laboratory created a substantial risk of harm to human life.[6]

## B. Constitutional Challenge

Defendants also contend section 2D1.1(b)(6) violates due process because its application could result in a disproportionate increase in offense level and could lead to widely disparate sentences. The constitutional concern raised by Defendants is that the punishment for the specific offense characteristic (i.e., for operating a methamphetamine laboratory that created a substantial risk of harm) is greater than the punishment for the substantive offense (i.e., manufacturing methamphetamine). In the cases of Dick and Layne, who each are in criminal history category IV, the guideline range for offense level 15 is 30–37 months, whereas the range for offense level 24 is 77–96 months. In the case of Ritchie, who is in criminal history category I, the guideline range for offense level 19 is 30–37 months, whereas the range for offense level 24 is 51–63 months. Hence, the application of section 2D1.1(b)(6) more than doubles Dick's and Layne's sentences; the impact on Ritchie is somewhat less severe.[7] Given these

---

5. The Court also notes Defendants discarded the waste products of their laboratory by pouring the chemicals down the apartment's drains. The Court was not able to determine this disposal method created a substantial risk to the environment in this case but, as a general rule, disposing of toxic chemicals in such manner in a residential area is obviously undesirable.

6. Defendants argue section 2D1.1(b)(6) creates a per se enhancement for all defendants who are guilty of manufacturing methamphetamine. This is incorrect, for the application note indicates the enhancement would not apply in remote areas. For heavily populated areas, however, Defendants are probably correct as a practical matter. Indeed, the legislative history of the enhancement suggests as

much. Still, the Court can conceive of circumstances in which the enhancement would not apply even in heavily populated areas, although such scenarios may not be realistic. If manufacturers took pains to ensure no risk was likely even if an explosion took place by, for example, installing adequate and secure fire barriers along the walls of the room, using an adequate exhaust hood, and setting up a proper chemical waste disposal system, then it is possible there would not be a substantial risk of harm either to human life or to the environment.

7. The provision to which Defendants object establishes a minimum offense level in the same fashion sections 2B1.1(b), 2B4.1(b), 2B5.1(b), 2B5.3(b), 2B6.1(b), 2F1.1(b), 2K1.3(b), 2K2.1(b), 2L1.1(b), 2P1.2(b), and

consequences, Defendants in essence complain the sentencing enhancement presents a classic instance of the tail wagging the dog—to borrow the colorful language of the United States Supreme Court in *McMillan v. Pennsylvania*, 477 U.S. 79, 88, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986).

As a general rule, any fact on which the application of a sentencing enhancement depends must be demonstrated by a preponderance of the evidence to satisfy due process. *McMillan*, 477 U.S. at 91–92, 106 S.Ct. 2411; *U.S. Sentencing Guidelines Manual* § 6A1.3. Under certain circumstances, however, clear and convincing evidence of a fact justifying a significant sentence enhancement *may* be required to satisfy due process. In particular, the government *may* be required to prove by clear and convincing evidence the existence of a sentencing factor if that application would "dramatically increase the sentence." *United States v. Watts*, 519 U.S. 148, 157, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997) (noting "a divergence of opinion among the Circuits as to whether, in extreme circumstances, relevant conduct that would dramatically increase the sentence must be based on clear and convincing evidence" without resolving the split); *see United States v. Masters*, 978 F.2d 281, 287 (7th Cir.1992) (noting the "clear and convincing" standard is not constitutionally-required); *United States v. Restrepo*, 946 F.2d 654, 659 (9th Cir.1991) (en banc) (requiring clear and convincing evidence before the application of an enhancement that would have "an extremely disproportionate effect" on a sentence relative to the offense of conviction but refraining from delineating the boundaries of extremely disproportionate effects); *United States v. Kikumura*, 918 F.2d 1084, 1101 (3rd Cir. 1990) (holding due process requires the government to prove sentencing facts by "clear and convincing" evidence when the district court makes a departure of great magnitude, as for example a departure from 30 months to 30 years). Hence, to pass constitutional muster, the fact on which the application of a sentencing enhancement depends *may* need to be proven by clear and convincing evidence if the application results in an extraordinary and disproportionate increase in offense level.

Because the United States Court of Appeals for the Sixth Circuit has yet to speak to the evidentiary standard required in circumstances such as that presented by this case, the Court will assume for present purposes only the Sixth Circuit would join the Third and Ninth Circuits in adopting the stricter standard. Even proceeding from this assumption, however, the Court concludes the government offered clear and convincing evidence at the sentencing hearing on which it can conclude Defendants operated a methamphetamine laboratory that created a substantial risk of harm to human life. (The Court ana-

2T1.1(b) do. The Court has found no case law holding any of these provisions unconstitutional. On the contrary, the Court considers the promulgation of a guideline provision establishing a minimum offense level to be analogous to the enactment of a mandatory minimum sentence. Statutory minimums are constitutional. *McMillan v. Pennsylvania*, 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986) (upholding the constitutionality of Pennsylvania's Mandatory Minimum Sentencing Act, which provides that anyone convicted of certain enumerated felonies is subject to a mandatory minimum sentence if the sentencing judge determines, by a preponderance of the evidence, that the defendant "visibly possessed a firearm" during the commission of the offense). Moreover, the minimum offense level provided by section 2D1.1(b)(6) was mandated by Congress. The Court therefore finds section 2D1.1(b)(6) to be constitutional. Accordingly, the fact Dick's and Layne's offense levels were increased nine levels, whereas Ritchie's offense level was increased only seven levels, is irrelevant and creates no due process violation.

lyzed the nature of this evidence in the context of Defendants' factual objection.) Although the consequences of section 2D1.1(b)(6) are significant, the Court cannot say they are extraordinary or that they result in "the tail wagging the dog." In any event, the resulting guideline ranges fall far below the statutory maximum of twenty years established for the offense of manufacturing methamphetamine. Accordingly, the Court finds the application of section 2D1.1(b)(6) does not violate Defendants' constitutional right to due process.

### III. CONCLUSION

For the foregoing reasons, the Court **DENIED** Defendants' in-court objections to the application of section 2D1.1(b)(6) of the *U.S. Sentencing Guidelines Manual* to the calculation of their sentences.

**SO ORDERED.**